John A. ROSE, President Pro Tempore of the Senate; Donald J. Blandford, Speaker of the House of Representatives, Appellants,

v.

The COUNCIL FOR BETTER EDUCATION, INC. et al., Appellees.

No. 88–SC–804–TG.

Supreme Court of Kentucky.

June 8, 1989.

As Modified Sept. 28, 1989.

William E. Scent, Karen Scent, Scent & Scent, PSC, Paducah, for appellants.

Bert T. Combs, Debra H. Dawahare, Wyatt, Tarrant & Combs, Lexington, Theodore H. Lavit, Lebanon, for appellees.

Philip M. Lanier, Louisville, for amicus curiae Prichard Committee for Academic Excellence.

Phillip J. Shepherd, Frankfort, for amicus curiae Prichard Committee for Academic Excellence and Kentuckians for the Commonwealth.

STEPHENS, Chief Justice.

The issue we decide on this appeal is whether the Kentucky General Assembly has complied with its constitutional mandate to "provide an efficient system of common schools throughout the state."[1]

In deciding that it has not, we intend no criticism of the substantial efforts made by the present General Assembly and by its predecessors, nor do we intend to substitute our judicial authority for the authority and discretion of the General Assembly. We are, rather, exercising our constitutional duty in declaring that, when we consider the evidence in the record, and when we apply the constitutional requirement of Section 183 to that evidence, it is crystal clear that the General Assembly has fallen short of its duty to enact legislation to provide for an efficient system of common schools throughout the state. In a word, the present system of common schools in Kentucky is not an "efficient" one in our view of the clear mandate of Section 183. The common school system in Kentucky is constitutionally deficient.

In reaching this decision, we are ever mindful of the immeasurable worth of education to our state and its citizens, especially to its young people. The framers of our constitution intended that each and every child in this state should receive a

1. Ky. Const. Sec. 183.

proper and an adequate education, *to be provided for by the General Assembly.* This opinion dutifully applies the constitutional test of Section 183 to the existing system of common schools. We do no more, nor may we do any less.

The goal of the framers of our constitution, and the polestar of this opinion, is eloquently and movingly stated in the landmark case of *Brown v. Board of Education:*

> "*education is perhaps the most important function of state and local governments.* Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. *Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.*" *Id.,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954) (emphasis added).

These thoughts were as applicable in 1891 when Section 183 was adopted as they are today and the goals they express reflect the goals set out by the framers of our Kentucky Constitution.

## I. PROCEDURAL HISTORY

This declaratory judgment action was filed in the Franklin Circuit Court by multiple plaintiffs, including the Council for Better Education, Inc. a non-profit Kentucky corporation whose membership consists of sixty-six local school districts in the state. Also joining as plaintiffs were the Boards of Education of the Dayton and Harlan Independent School Districts and the school districts of Elliott, Knox, McCreary, Morgan and Wolfe Counties. Twenty-two public school students from McCreary, Wolfe, Morgan and Elliott Counties and Harlan and Dayton Independent School districts were also named, suing, respectively, by and through their parents as next friends.

An averment was made in the original complaint that the student-plaintiffs were not only suing as individuals but also representing a class of all similarly situated students attending so-called "poor" school districts. The requisites of a class action were pleaded. Civil Rule 23 [hereinafter CR].

The defendants named in the complaint were the Governor, the Superintendent of Public Instruction, the State Treasurer, the President *Pro Tempore* of the Senate, the Speaker of the House of Representatives and the State Board of Education and its individual members.

The complaint included allegations that the system of school financing provided for by the General Assembly is inadequate; places too much emphasis on local school board resources; and results in inadequacies, inequities and inequalities throughout the state so as to result in an inefficient system of common school education in violation of Kentucky Constitution, Sections 1, 3 and 183 and the equal protection clause and the due process of law clause of the 14th Amendment to the United States Constitution. Additionally the complaint maintains the entire system is not efficient under the mandate of Section 183.

The relief sought by the plaintiffs was a declaration of rights to the effect that the system be declared unconstitutional; that the funding of schools also be determined to be unconstitutional and inadequate; that the defendant, Superintendent of Public Instruction be enjoined from further implementing said school statutes; that a mandamus be issued, directing the Governor to recommend to the General Assembly the enactment of appropriate legislation which would be in compliance with the aforementioned constitutional provisions; that a mandamus be issued, directing the President *Pro Tempore* of the Senate and the Speaker of the House of Representatives to place before the General Assembly appropriate legislation which is constitutionally

valid; and that a mandamus be issued, directing the General Assembly to provide for an "equitable and adequate funding program for all school children so as to establish an 'efficient system of common schools.'"

The answers filed by the various defendants were basically identical. It was pled that the complaint failed to state a claim against any of the defendants; that the court had no jurisdiction because the subject matter is purely a "political" one; that all school boards should have been joined as parties defendants; that all members of the General Assembly (1986) should also have been joined as parties defendant; that all the plaintiffs lacked standing to bring the action; that, specifically, the plaintiff Council for Better Education, Inc., had no legal authority to sue; that the plaintiff school boards similarly had no legal authority to sue; that the class action was improper; and as would be expected, the defendants denied all of the alleged constitutional violations and the facts underlying such alleged violations.

The defendants also filed a self-styled "affirmative defense" claiming that education reform laws passed by the General Assembly at a special session in 1985 and various budget changes and other educational laws passed by the General Assembly at its 1986 regular session inferentially corrected the situation alleged in the complaint. Reference was also made to past legislative efforts of the General Assembly in the education field, presumably to further demonstrate the General Assembly's compliance with its constitutional mandate.

In the trial court, the defendants moved for a summary judgment, based primarily on the claim that no relief could be granted against the General Assembly because of lack of service on all 138 members thereof and that the parties lacked standing or legal capacity to sue. The trial court overruled this motion in its entirety.

The case was tried by the court without the intervention of a jury. Evidence was presented by deposition, along with oral testimony and much documentary evidence. The trial court entered the first of several orders, findings of fact and judgments on

2. An analysis of these documents follows.

May 31, 1988.[2] Generally, that order found Kentucky's common school finance system to be unconstitutional and discriminatory and held that the General Assembly had not produced an efficient system of common schools throughout the state. On October 14, 1988 a final, appealable judgment was entered.

A notice of appeal was timely filed by the present appellants, John A. Rose, President *Pro Tempore* of the Senate of Kentucky and Donald J. Blandford, Speaker of the House of Representatives of Kentucky.

Upon a motion properly made, we transferred the appeal to this Court.

## II. ANALYSIS OF TRIAL COURT'S FINDINGS OF FACT

### CONCLUSIONS OF LAW AND JUDGMENT

Following the trial of this case, the circuit judge, in three separate documents, prepared extensive findings of fact, conclusions of law and judgment(s). Because of the length of these documents, we feel it important to analyze them in some detail.

### DOCUMENT NUMBER I

Following the bench trial, and upon proper submission, the judge on May 31, 1988 entered a document that is styled, "Findings of Fact, Conclusions of Law and Judgment."

The trial judge identified four issues before him: (1) The necessity for defining the phrase "an efficient system of common schools" as contained in Section 183 of the Kentucky Constitution; (2) Whether education is a "fundamental right" under our Constitution; (3) Whether Kentucky's current method of financing its common schools violates Section 183, and (4) Whether students in the so-called "poor" school districts are denied equal protection of the laws.

"Efficient," in the Kentucky constitutional sense was defined as a system which required "substantial uniformity, substan-

tial equality of financial resources and substantial equal educational opportunity for all students." Efficient was also interpreted to require that the educational system must be adequate, uniform and unitary.

Because of the language of Section 183, the trial court ruled that education, indeed, is a fundamental right in Kentucky.

In ruling on the issue of whether Kentucky's method of school financing violates Section 183 and underpinning the point with extensive findings of fact, the trial court declared that students in property poor school districts are offered a minimal level of educational opportunities, which is inferior to those offered to students in more affluent districts. Such "invidious" discrimination, based on the place of a student's residence, was determined to be unconstitutional. The trial court ruled that the school finance system violates the equal protection guarantees of Section 1 and 3 of the Kentucky Constitution.

In its judgment, the trial court ruled: (1) The Kentucky finance "system" of its common schools is unconstitutional and discriminatory; and (2) The system of common schools is not efficient within the purview of Section 183 of the Kentucky Constitution. The Court indicated it would appoint a "small select committee," the purpose of which was to review all relevant data, provide additional analysis, consult with financial experts and propose remedies to "correct the deficiencies in the present common school financing system." The Court clearly stated that the Committee's plan, "when adopted by this Court," would not "intrude" on the prerogatives of the Executive and Legislative branches of government. Indeed, the report would only be an aid to serve as a guide in establishing "the parameters of the Constitutional requirements of Sections 1, 3 and 183."

In this open ended document, the Court ruled the school finance system unconstitutional, but gave few guidelines, or criteria, to guide the General Assembly in any action it might take to rectify the constitutional failure. The work of the Committee, if adopted by the Court, was to serve as a guidepost in this murky area.

## DOCUMENT NUMBER II

On June 7, 1988, the trial court, in this document, appointed the members of the "select committee." Apparently fearing he would improperly delegate some of his judicial authority by the creation of this committee, the trial judge emphasized that its role would be "advisory only" to him. But he noted that the report would be of "immense benefit" to him in preparing his final judgment. The Committee was ordered to complete its work by September 15, 1988.

Modifying or explaining part of document #I, the court emphatically stated that there is "no judicial intent to merely redivide the funds now available to the common school districts." Moreover, he emphasized that funds should not be taken away (presumably by the General Assembly) from any school district to increase the funding level of more impoverished districts. It is a fair inference from this statement that the trial court was strongly suggesting that additional revenues were needed to make the system "efficient."

The defendant State Board of Education was ordered to pay, out of its funds, all expenses of the Committee.

## DOCUMENT NUMBER III

This final order entered on October 14, 1988, and, cumulated with the first two documents, constitutes the subject matter of this appeal.

Addressing the committee report, but steadfastly maintaining that the report adopted was only part of his decision, the court agreed that the goals set out by the committee for the establishment of an "efficient" school system were "salutary" ones. While not technically adopting the report as part of this final Findings of Fact, Conclusions of Law and Judgment, it is clear that the trial court did, indeed, adopt certain principles from the Committee's report.

In his additional Findings of Fact, the judge modified his previous definition of an "efficient" system of schools. It is a "...

tax supported, coordinated organization, which provides a free, adequate education to all students throughout the state, regardless of geographical location or local fiscal resources." He opined that an efficient system (of schools) must have "substantial" uniformity.

Ever broadening the definition and setting non-instructional standards, the trial court required an efficient school system to provide sufficient physical facilities, teachers, support personnel, and instructional materials to enhance the educational process. An adequate school system must also include careful and comprehensive supervision at all levels to monitor personnel performance and minimize waste. If and where waste and mismanagement exist, including but not limited to improper nepotism, favoritism, and misallocation of school monies, they must be eliminated, through state intervention if necessary. The General Assembly has all the power necessary to guarantee that the resources provided by Kentucky taxpayers for schools are spent wisely.

The trial court thus, with a very broad brush, included in its constitutional definition of "efficient" goals to be met by an education and requirements as to school financing, curriculum, personnel, accessibility to all children, physical facilities, instructional materials and management of the schools.

Moreover, the trial court made it clear that the duty—the absolute, unequivocal duty—to provide this system is *solely* the responsibility of the General Assembly. The court reiterated that its judicial power did not extend to specifying to the General Assembly the methods by which to implement and maintain this efficient system of education.

Addressing again the question of financing this massive task, the trial court stated directly what had been implied previously, that "substantial additional monies" will have to be raised to provide this constitutional school system. The court suggested three possible ways of financing: 1) increasing existing taxes, 2) levying new taxes, or 3) reallocating existing funds. Since

a major reallocation of funds would "cripple" other government functions, the trial court postulated that the imposition of new taxes appeared to be the only viable alternative.

The trial judge agreed that the separation of powers doctrine would prohibit courts from directing the General Assembly as to how the school system should be financed. But, he reiterated that the General Assembly must provide an efficient system.

Finally, although the trial court encouraged the protection of local school boards, he re-emphasized the General Assembly's authority and responsibility for the establishment and maintenance of the school system.

In the "judgment," the trial judge retained continuing jurisdiction over the subject matter for the purpose of enforcing the judgment. To that effect, he ordered a progress report be made to him on a day certain.

With this lengthy and dramatic series of documents, the Franklin Circuit Court brought into sharp focus a problem that many dedicated citizens of the Commonwealth have "wrestled" with for many years. It placed the sole responsibility for the establishment and maintenance of an efficient system on the General Assembly. It defined "efficient" in an multi-faceted manner, and directed that all these criteria are not only relevant, but are essential, if the development of a constitutionally valid system of common schools is to be had.

The trial court examined the evidence and declared that the present school system was unconstitutional.

On appeal, this Court must now review the basis for the trial court's ruling.

### III. CONTENTIONS OF THE PARTIES

The two remaining defendants, now appellants before this Court, raise numerous issues on appeal. They allege that the Council for Better Education, Inc., does not have either the legal authority or the standing to maintain this action; that the purported class action of the student plaintiffs

is not proper; that only 5 of the 22 students are properly before the Court; that the complaint does not state a "cognizable claim" against the two named legislators; that the trial court erred in finding that the system of common schools provided by the General Assembly is not efficient; that the trial court erred in ruling that House Bill 1 and House Bill 44 are part of an unconstitutional system;[3] that the trial court's definition and standards set for an efficient school system are at variance with Section 183; that the trial court's strong reliance on foreign cases was inappropriate; that the trial court erred in declaring that the school system violates the 14th Amendment of the U.S. Constitution; that the trial court's judgment violates the separation of powers provisions of the Kentucky Constitution; and finally, it is claimed that the trial court erred in directing the expenses of the select committee to be paid by the Kentucky Department of Education.

Appellees, predictably, defend the trial court's action.

Prior to dealing with these contentions we believe it would be beneficial to give a brief history of school financing in Kentucky, and to review the evidence before us.

## IV. SCHOOL FINANCING IN KENTUCKY—PAST AND PRESENT

As originally enacted, Section 186 of our Constitution mandated that school funds appropriated by the General Assembly be apportioned to each individual local school district on the basis of a set amount for each child aged 5 through to 17 years. Thus, state money was given on the basis of a census of school age children—whether they attended school or not. Differences in populations of the districts were not perceived as affecting the quality of the education.

In 1930, the General Assembly adopted a law (an Act approved March 15, 1930, Ch. 36, 1930 Ky. Acts, codified at KS 4364, 4399a–8, 4434a–14a) which appropriated state money for an equalization fund designed to increase per-pupil expenditures in those districts where the standard of education was low. That legislative effort was invalidated in *Talbott v. Kentucky State Board of Education*, 244 Ky. 826, 52 S.W.2d 727 (1932). The basis of the decision was that the attempt to equalize expenditures violated the mandate of Section 186—viz., state funds are limited to a per capita appropriation.

In 1941, Section 186 was amended to permit 10% of state funds to be used for equalization purposes and in 1944 it was further amended to allow 25% of the funds to be so expended. In 1952, the constitutional provision requiring per capita expenditures was eliminated, thus strengthening the role of the General Assembly in its duty to provide for an efficient system of common schools, as provided in Section 183.

In an apparent response to that latest constitutional amendment, and in an attempt to equalize inequities in the educational efforts and abilities to encourage more financial input and effort by local school districts, the General Assembly enacted the so-called Minimum Foundation Program[4] [hereinafter MFP]. To qualify as a participant in this program, a district was required to levy a minimum real property tax of $1.10 per $100 of assessed value in the district. The maximum tax was set at $1.50 per $100.00 of assessed value (1½% of the total assessed value of the real property in the district). Most districts levied the maximum rates, because the assessed values were very low. The assessments ranged from 33⅓% of the fair cash value of the property to as low as 12½% of that value. The median statewide assessment rate was 27%.

---

**3.** H.B. 1 is codified as KRS 160.470 and H.B. 44 is codified in KRS 68.245, 132.-010, .020, .023, .027, .690, other sections of Ch. 32, and 160.470. Throughout this opinion, the legislation will be referred to as H.B. 1 and H.B. 44.

**4.** KRS 157.310–.440. Its stated legislative purpose was "... to assure substantially equal public school educational opportunities." KRS 157.310. A further description of the MFP appears, *infra.*

As a result of this law and diverse local assessments of fair cash value, a lawsuit was filed directly attacking this legislation and the problem of built-in disparity in local school tax levies. Our Court's predecessor, the Court of Appeals, in the case of *Russman v. Luckett*, Ky., 391 S.W.2d 694 (1965), declared that Section 172 of the Kentucky Constitution requires property to be assessed at 100% of its fair cash value. The mandate of the Court directed the Revenue Cabinet to see that all property in the Commonwealth was so assessed.

The ink was barely dry on this opinion, when, pursuant to a call for a special session by the Governor, the General Assembly enacted H.B. 1, known pleasantly as the "rollback law." Its effect was to countermand and negate the effect of *Russman*. This law reduced the tax rates on property proportionately to offset the increase in assessment required by this Court. It is certainly arguable that, by enacting the "rollback law," the General Assembly continued, or even exacerbated, the inequities that *Russman* intended to correct. Specifically, H.B. 1 reduced the school, county and city property tax revenues to the 1965 level, except for "net assessment growth" resulting from new property.[5] In deference to the education problem, the bill permitted local school districts to take two (2) one-time only 10% increases in their tax levies, for their 1967 and 1968 revenues. The bill virtually froze the revenues available to local school districts and created the ominous spectacle of different maximum tax rates for the then 180 local school districts in Kentucky.

In an attempt to enable more local tax efforts the General Assembly at its regular session in 1966 enacted legislation[6] which enabled local school districts to levy one of three specialized permissive taxes: (1) an occupational tax on wages and profits; (2) a tax on gross utility receipts, and (3) an excise tax on income. All of these taxes were, however, specifically permitted to be recalled by the voters.[7]

The story continues. At its regular session in 1972, the General Assembly redefined the terms "net assessment growth" to include not only new property, but also the difference in the assessed valuation of all property subject to tax in the previous year, thus boosting total revenues by the tax on property value inflation.

In 1976, the handling of revenue took another turn. The General Assembly transferred the levy and collection of the required local tax effort to the State, to be included as part of the receipts of the General Fund.[8] To provide funds which would help equalize, to some extent, the disparities in local financial effort, the General Assembly, also in 1976 passed the so-called Power Equalization Program[9] [hereinafter PEP].

In 1979, the then Lieutenant Governor, in the Governor's absence from the state, called yet another special session of the General Assembly. At that session, H.B. 44 was enacted. This law required school districts to *reduce* their tax rates on real property each year so that current revenue could not exceed the previous year's revenue by more than 4%. However, in order to institute any increase in revenue, H.B. 44 required the elected school board members to hold a public hearing on the matter. If the proposed increase (through a *tax rate* increase) would generate more than the 4% increase, the voters could force a public referendum on the excess. In other words, an increase of up to 4% (over the

---

5. Examples include a vacant lot having a house built on it or a farm being developed into a subdivision.

6. KRS 160.597.

7. The effect of the permissive taxes has been to create further inequities across the state because, even if the voters did not veto them, those counties with a high population and high payrolls would produce many times more revenue than counties (districts) not so blessed.

8. As the trial judge stated, the appearance that this created additional monies was strictly an illusion; rather it altered the *method* of levy and collection. No new funds were provided to local schools by the state.

9. KRS 157.545 et seq. The relevant details of this program (PEP) will be discussed *infra*.

previous year) would not be approved without a public hearing. If the increase proposed were more than 4%, the excess thereof was subject to a vote of the public.

The record in this case shows the property tax rate declined statewide nearly 33% from 1979 to 1981, directly as a result of H.B. 44. Although the tax base (total assessed value) has increased, there has been little or no increase in local revenues for schools.

As can be seen, the state's contribution to the local school programs (the so-called common schools) arises primarily from the MFP and the PEP. It is essential to a decision in this case to give a brief summary of each of these legislative acts.

To qualify as a participant in the MFP, a local school district must operate and pay its teachers for 185 days per school year, and it must actually operate its school(s) the same number of days. The State Superintendent of Public Instruction allots the classroom units to each district, the number of which depends on the average daily attendance in each grade. Each district receives a grant of money from the MFP based on the number of classroom units assigned to it. The funds may be used for teachers' salaries, current expenses, capital outlay and transportation of students.

The state also provides financial resources to local school districts through the PEP. Each year, the Kentucky Department of Revenue determines the equalized fair cash value of all taxable property in each local school district. That data is certified to the Superintendent of Public Instruction. The Superintendent determines annually the maximum tax rate that the PEP fund will equalize and then applies an equal rate to all districts. In order for a local district to receive funds, each local school district must levy a minimum equivalent tax rate of 25 cents per $100 of valuation, or the maximum rate supported by the PEP, whichever is greater. The "minimum equivalent tax rate" is defined as the quotient derived from dividing the districts' previous year's income from tax levies by the total assessed property valuation plus the assessment for motor vehicles.

As pointed out by the trial court, the mandated underlying tax rate has been so low that the results have been that only a fraction of the 25 cents local tax is actually equalized through the PEP.[10]

If one were to summarize the history of school funding in Kentucky, one might well say that every forward step taken to provide funds to local districts and to equalize money spent for the poor districts has been countered by one backward step.

It is certainly true that the General Assembly, over the years, has made substantial efforts to infuse money into the system to improve and equalize the educational efforts in the common schools of Kentucky. What we must decide, based solely on the evidence in the record as tested by the Kentucky Constitution, Section 183, is whether the trial court was correct in declaring that those efforts have failed to create an efficient system of common schools in this Commonwealth.

## V. THE EVIDENCE

■ As we proceed to summarize the evidence before us, the legal test we must apply is whether that evidence supports the conclusion of the trial court that the Kentucky system of common schools is not efficient.[11] It is textbook law that before an appellate court may overturn the trial court's finding, such finding must be clearly erroneous. CR 52.01; *Yates v. Wilson*, Ky., 339 S.W.2d 458 (1960).

The evidence in this case consists of numerous depositions, volumes of oral evidence heard by the trial court, and a seemingly endless amount of statistical data, reports, etc. We will not unduly lengthen this opinion with an extensive discussion of

10. Nine cents per hundred in 1985–86, 10 cents *per hundred* in 1986–87, and 13 cents per hundred thereafter.

11. Obviously, we will consider (later in the opinion) as a legal proposition, whether the trial court's definition of "efficient" within the aegis of Kentucky Constitution, Section 183 is correct.

that evidence. As a matter of fact, such is really not necessary. The overall effect of appellants' evidence is a virtual concession that Kentucky's system of common schools is underfunded and inadequate; is fraught with inequalities and inequities throughout the 177 local school districts; is ranked nationally in the lower 20–25% in virtually every category that is used to evaluate educational performance; and is not uniform among the districts in educational opportunities. When one considers the evidence presented by the appellants, there is little or no evidence to even begin to negate that of the appellees. The tidal wave of the appellees' evidence literally engulfs that of the appellants.

In spite of the Minimum Foundation Program and the Power Equalization Program, there are wide variations in financial resources and dispositions thereof which result in unequal educational opportunities throughout Kentucky. The local districts have large variances in taxable property per student. Even a total elimination of all mismanagement and waste in local school districts would not correct the situation as it now exists. A substantial difference in the curricula offered in the poorer districts contrasts with that of the richer districts, particularly in the areas of foreign language, science, mathematics, music and art.

The achievement test scores in the poorer districts are lower than those in the richer districts and expert opinion clearly established that there is a correlation between those scores and the wealth of the district. Student-teacher ratios are higher in the poorer districts. Moreover, although Kentucky's per capita income is low, it makes an even lower per capita effort to support the common schools.

Students in property poor districts receive inadequate and inferior educational opportunities as compared to those offered to those students in the more affluent districts.

That Kentucky's overall effort and resulting achievement in the area of primary and secondary education are comparatively low, nationally, is not in dispute. Thirty-five percent of our adult population are high school drop-outs. Eighty percent of Kentucky's local school districts are identified as being "poor," in terms of taxable property. The other twenty percent remain under the national average. Thirty percent of our local school districts are "functionally bankrupt."

Evidence relative to educational performance was introduced by appellees to make a comparison of Kentucky with its neighbors —Ohio, Indiana, Illinois, Missouri, Tennessee, Virginia, and West Virginia. It also ranked Kentucky, nationally in the same areas.

In the area of per pupil expenditures, Kentucky ranks 6th among the 8 states and ranks 40th, nationally. With respect to the average annual salary of instructional staff, Kentucky again ranks 6th among its neighbors and 37th nationally. In the area of classroom teacher compensation, Kentucky is 7th and 37th. Our classroom teacher average salary is 84.68% of the national average and our per pupil expenditure is 78.20% of the national average.

When one considers the use of property taxes as a percent of sources of school revenue, Kentucky is 7th among our neighboring states and 43rd nationally. The national average is 30.1% while Kentucky's rate is 18.2%. If any more evidence is needed to show the inadequacy of our overall effort, consider that only 68.2% of ninth grade students eventually graduate from high school in Kentucky. That ranks us 7th among our eight adjacent sister states. Among the 6 of our neighboring states that use the ACT scholastic achievement test, our high school graduates average score is 18.1, which ranks us 4th. Kentucky's ratio of pupil-teacher is 19.2, which ranks us 7th in this region. In spite of the appellants' claim, at both the trial level and on appeal, that appellees' statistics are not current, all the above figures are based on a 1986 study, which was published in 1987.

Numerous well-qualified educators and school administrators testified before the trial court and all described Kentucky's educational effort as being inadequate and well below the national effort.

With this background of Kentucky's overall effort with regard to education and its comparison to other states in the area, and nationally, we proceed to examine the trial court's finding relative to inequity and lack of uniformity in the overabundance of local school districts. We will discuss the educational opportunities offered and then address the disparity in financial effort and support.

## EDUCATIONAL EFFORT

The numerous witnesses that testified before the trial court are recognized experts in the field of primary and secondary education. They have advanced college degrees, they have taught school, they have been school administrators, they have been participants at a local or state level in Kentucky's education system, and they have performed in-depth studies of Kentucky's system. Without exception, they testified that there is great disparity in the poor and the more affluent school districts with regard to classroom teachers' pay; provision of basic educational materials; student-teacher ratio; curriculum; quality of basic management; size, adequacy and condition of school physical plants; and per year expenditure per student. Kentucky's children, simply because of their place of residence, are offered a virtual hodgepodge of educational opportunities. The quality of education in the poorer local school districts is substantially less in most, if not all, of the above categories.

Can anyone seriously argue that these disparities do not affect the basic educational opportunities of those children in the poorer districts? To ask the question is to answer it. Children in 80% of local school districts in this Commonwealth are not as well-educated as those in the other 20%.

Moreover, most of the witnesses before the trial court testified that not only were the state's educational opportunities unequal and lacking in uniformity, but that *all* were inadequate. Testimony indicated that not only do the so-called poorer districts provide inadequate education to fulfill the needs of the students but the more

affluent districts' efforts are inadequate as well, as judged by accepted national standards.

As stated, when one reads the record, and when one considers the argument of counsel for the appellants, one can find no proof, no statement that contradicts the evidence about the existing inequalities and lack of uniformity in the overall performance of Kentucky's system of common schools.

Summarizing appellants' argument, and without intending to give it short shrift, it is contended that over the years the General Assembly has continually enacted such programs as the MFP, the PEP, and other progressive programs during recent sessions of the General Assembly. Moreover, uncontroverted evidence is adduced to show that the overall amount of money appropriated for local schools has increased by a substantial amount. The argument seems to be to the effect that "we have done our best." However, it is significant that *all* the experts were keenly aware of the legislative history, including substantive legislation and increased funding and yet, all of them stated that inequalities still exist, and indeed have been exacerbated by some of the legislation. Appellants conceded, the trial court found and we concur that in spite of legislative efforts, the total local and state effort in education in Kentucky's primary and secondary education is inadequate and is lacking in uniformity. It is discriminatory as to the children served in 80% of our local school districts.

## FINANCIAL EFFORT

Uniform testimony of the expert witnesses at trial, corroborated by data, showed a definite correlation between the money spent per child on education and the quality of the education received. As we have previously stated in our discussion of the history of Kentucky's school finances, our system does not *require* a minimum local effort. The MFP, being based on average daily attendance, certainly infuses more money into each local district, but is not designed to correct problems of inequality and lack of uniformity between

local school districts. The experts stated that the PEP, although a good idea, was and is underfunded.

The disparity in per pupil expenditure by the local school boards runs in the thousands of dollars per year. Moreover, between the extreme high allocation and the extreme low allocation lies a wide range of annual per pupil expenditures. In theory (and perhaps in actual practice) there could be 177 different per pupil expenditures, thus leading to 177 different educational efforts. The financing effort of local school districts is, figuratively speaking, a jigsaw puzzle.

It is argued by the appellants that the so-called permissive taxes,[12] are at least part of the solution to equalizing local financial efforts. There are two easy answers that dispose of this argument. First, the taxes are permissive. Responding to obvious voter resistance to the imposition of taxes, 89 districts have enacted the tax on gross utility receipts; 5 districts have enacted the occupational tax; 82 districts have also enacted a special building tax, normally for a specific project for one time only, and not affecting teacher pay, instructional equipment, or any of the specific needs of educational opportunity. As the nature of the taxes is permissive, in many districts they are not adopted and therefore do not produce one cent in additional local revenue.

Secondly, according to the testimony of the expert witnesses, even if all the permissive taxes were enacted, the financial effort would still be inadequate, and because the population of the districts is in direct proportion to the amount of money that could and is raised by these taxes, the overall problem of an unequal local effort would be exacerbated by such action. Clearly, the permissive taxes are not the solution to the problems. Rather, they contribute to the disparity of per pupil expenditures.

Additionally, because the assessable and taxable real and personal property in the 177 districts is so varied, and because of a lack of uniformity in tax rates, the local school boards' tax effort is not only lacking in uniformity but is also lacking in adequate effort. The history of school financing in Kentucky, certainly corroborates the trial court's finding as to the lack of uniformity and the lack of adequacy of local and state funding of education in the state. Based on the record before us, it is beyond cavil that the trial court's finding was correct.

Having discussed the procedure, the contentions of the parties, the history of school finance, and having briefly analyzed the facts, we now proceed to discuss the legal arguments raised before us by the parties.

## VI. DO THE LOCAL SCHOOL BOARDS AND THE COUNCIL FOR BETTER EDUCATION,[13] INC. HAVE THE LEGAL AUTHORITY TO SUE THE LEGISLATORS AND DO THEY HAVE THE STANDING TO MAINTAIN THE ACTION?

There are two clear and distinct issues to be decided: (1) Do the Council and the local school districts have *legal authority* to sue two members of the General Assembly; and (2) Do those same plaintiffs-appellees have the *legal standing* to sue?

In considering these issues, we note again that the Council is a non-profit corporation, consisting of sixty-six local school districts. It is a separate, legally constituted authority, formed under the laws of Kentucky.[14] The several local county and independent school districts are also formed under Kentucky statutes.[15]

### LEGAL AUTHORITY

The main thrust of appellants' argument is that the local boards of education, being creatures of the state, cannot sue it. Even though the Council is a non-profit corporation it is claimed that because the Council's

---

**12.** *See supra* note 6 and accompanying text.

**13.** Hereinafter referred to as Council.

**14.** KRS Ch. 273.

**15.** KRS Ch. 160.

members are all local boards of education, the Council, whose corporate veil is pierced by some strained logic, is also a servant who cannot challenge the master. We disagree.

In creating the local boards of education, the General Assembly endowed them with broad and specific powers to enable them to execute their statutory mission. "Each board of education shall have general control and management of the public schools in its district...." KRS 160.290(1). It is empowered to promote public education and "the education and the general health and welfare of pupils." *Id.*

> "... *Each board of education shall be a body politic and corporate with perpetual succession. It may sue and be sued; and do all things necessary to accomplish the purposes for which it is created ....*" KRS 160.-160 (emphasis added).

This corporate body politic is specifically granted the power to do *"all things necessary"* to carry out its duties and responsibilities, including exercising its right to sue and be sued. Nowhere in the statutes can one find a restriction on the right of the local boards to sue. The General Assembly has not stated that it cannot be sued by local boards. The subject matter of this lawsuit is whether the General Assembly has complied with its constitutional duty to provide an "efficient" system of common schools in Kentucky. Who is better qualified, who is more knowledgeable, who is more duty-bound, than the local school boards to raise the question? If the General Assembly is not adequately meeting its responsibility, how can the local boards meet theirs?

It is sterile logic that says that the local school boards cannot sue their masters, the General Assembly (or the Commonwealth), especially when one considers the statutory grants of authority cited above.

Appellants rely on the case of *Board of Education of Louisville v. Board of Education of Jefferson County*, Ky., 458 S.W.2d 6 (1970), to support their argument. In that case, the question presented was whether the General Assembly had the au-

thority to distribute the proceeds of a county-wide occupational tax among the Louisville, Jefferson County and Anchorage Independent school districts, the effect of which would be that some of the funds raised in Louisville would be distributed to the County and to Anchorage Independent districts. The Louisville district argued in that case that it was a municipal corporation and that its funds could not be used elsewhere. This Court rejected this argument and upheld the General Assembly's authority to determine the distribution of Jefferson County's occupational tax proceeds.

The Court's decision was based on whether the legislation was "appropriate" under the provisions of Section 183 of the Kentucky Constitution.

> " 'The General Assembly shall, by *appropriate* legislation, provide for an efficient system of common schools throughout the state.' " *Id.* at 8 (emphasis added).

We said that legislation is only inappropriate if it conflicts with some other constitutional provisions of equal dignity. In declaring the Louisville Board not to be a municipal corporation, the Court stated:

> "Thus, though a school district possesses some of the attributes of a municipal corporation for some legal purposes ... and though a school district is regarded as a political subdivision for some legal considerations—*a school district is, nevertheless, an agency of the state subject to the will of the legislature and existing for one public purpose only— to locally administer the common schools within a particular area subject to the paramount interest of the state.*" *Id.* at 8–9 (emphasis added).

Appellants seize upon this language to posit that local boards are not empowered to sue the state. We do not agree. This language simply reiterates that the local districts are creatures of the state, and that when the issue of "appropriate legislation" is in contention, the state's decision is final, unless violative of another section of the constitution. The decision does not touch the issue of whether the state has provided

an efficient system, and it certainly does not declare either directly or inferentially that a local school board cannot sue the state. Furthermore, appellants ignore the specific grant of power to local school boards to "sue or be sued" and *to do all things necessary* to carry out the duties of the local school boards.

In *Hogan v. Glasscock*, Ky., 324 S.W.2d 815 (1959) we held that a local school board had the power to hire an attorney when such employment was necessary for their protection and the accomplishment of the purposes for which they were created. The attorneys were employed by the local board to defend an attack on the board members' method of providing public education. This case clearly reinforces the statutory duty of local school boards to promote local education and to defend lawsuits challenging their action, and to do all things which are necessary in the opinion of the local board to promote public education. KRS 160.160, 160.290(1).

Appellants rely heavily on a case from a sister state to support their position. In *East Jackson Public Schools v. State*, 133 Mich.App. 132, 348 N.W.2d 303 (1984), several local school districts sought to overturn a legislative scheme of school financing, claiming a violation of the equal protection clause of the Michigan constitution. The boards did not claim to enforce any constitutional rights regarding public education. As the Court stated, "Education is not a fundamental right under Michigan Constitution of 1963." *Id* at 305. The following language seized on by appellants addressed the school districts' power to sue.

"School districts and other municipal corporations are creatures of the state. Except as provided by their state, they have no existence, no function, no rights, and no powers. They are given no power, nor can any be implied, to defy their creator over the terms of their existence.

They surely have no power to bring suits of such nature on behalf of residents within their boundaries, or to expend public funds to finance such litigation of, or on behalf of, private citizens." *Id* at 306.

Although the language of this opinion is strong and unequivocal, it cites no authority for its position, and is certainly not persuasive in the case at bar.[16]

Unlike Michigan citizens, our citizens are given a fundamental right to education in our Constitution. Ky. Const. Sec. 183. That fundamental right is reiterated and expanded in our statutes. KRS 158.010 et seq. Moreover, our General Assembly has given local districts a perpetual, corporate existence, and has in two statutes, specifically given local boards virtual unlimited authority to carry out their duty of promoting local education.

In *Reeves v. Jefferson County*, Ky., 245 S.W.2d 606 (1951), we declared that KRS 160.160 and KRS 160.290 "place upon the boards of education, not the taxpayers, the initial responsibility of maintaining legal actions on behalf of the school districts." *Id.* at 608. Perforce a lawsuit to declare an education system unconstitutional falls within the authority, if not the duty, of local school boards to fulfill their statutory responsibilities, no matter who the defendants are.

Even if we had not reached this conclusion as to the individual county and local independent school districts, it is beyond cavil that the Council, being an independent, legally separate, properly formed non-profit corporation, has the legal authority to sue the General Assembly. We are cited no authority, and can find none, that would enable us to pierce the corporate veil and legally cut off the rights of the individual corporate members.

---

**16.** Furthermore, there is ample authority which is contrary to the Michigan case. *See Dupree v. Alma School District No. 30,* 279 Ark. 340, 651 S.W.2d 90 (1983); *Hornbeck v. Somerset County Board of Education,* 295 Md. 597, 458 A.2d 758 (1983); *Board of Education v. Nyquist,* 57 N.Y.2d 27, 453 N.Y.S.2d 643, 439 N.E.2d 359 (1982); *Seattle School District No. 1 of King County v. State,* 90 Wash.2d 476, 585 P.2d 71 (1978); *Washakie County School District No. 1 v. Herschler,* 606 P.2d 310 (Wyo.1980).

## STANDING

Appellants next argue that the Council and the local school boards have no standing to join in this lawsuit.

▮ In order to have standing to sue, a plaintiff need only have a real and substantial interest in the subject matter of the litigation, as opposed to a mere expectancy. *Winn v. First Bank of Irvington,* Ky.App., 581 S.W.2d 21, 23 (1978). And, as we have said:

"It is fundamental that in order to have standing in a lawsuit a party must have a judicially recognizable interest in the subject matter of the suit." *HealthAmerica Corporation of Kentucky v. Humana Health Plan Inc.,* Ky., 697 S.W.2d 946, 947 (1985).

The issue of standing is one which is to be decided on the facts of each case.

▮ The Council and the local school boards as plaintiffs in this case are statutorily obligated to promote public education for their respective constituents—the students in their school districts. The local districts are part and parcel of a system of common schools created by the General Assembly, which purports to be constitutionally efficient. If the system is not efficient, the local school board's duty is to make every effort to remedy that situation. Included in that responsibility is the filing of this lawsuit. The local school board and the Council have a judicially recognizable interest in a system of efficient common schools, and we so recognize and declare.

## VII. IS THIS A PROPER CLASS ACTION WITH RESPECT TO THE INDIVIDUAL STUDENT PLAINTIFFS?

▮ Twenty-two student plaintiffs, suing by and through their parents as next friends, argued to the trial court that they were entitled to maintain the lawsuit as a class action on behalf of "all similarly situated students in Kentucky's property-poor districts." Appellants deny appellees' claim.

CR 23.01 authorizes the filing of a class action and sets up the requirements therefore. CR 23.03 requires the trial court, "as soon as practicable after the commencement of an action brought as a class action" to make a determination "by order" as to whether a class action may be maintained.

It is clear that when the trial court fails to make findings of fact and fails to certify the evidence of a class, within the purview of CR 23, there can be no class action. *Brockman v. Jones,* Ky.App., 610 S.W.2d 943 (1980).

No hearing was held by the trial court in this case, no findings of fact were made by the trial court as to the propriety of a class action, and none of the requirements of CR 23.01 or 23.03 were followed. In fact, the only reference to a class action other than in the pleadings appears in Document # 1, dated May 31, 1988, in which the court, in its findings of fact identified some of the plaintiffs as "a number of parents and individual students representing as a class all similarly situated students in Kentucky's districts."

For the failure of the trial court to follow the mandate of CR 23.01 and 23.03, appellants argue there was no class action. We concur.

▮ However, the absence of, or the failure to create a proper class, in no way changes the decision of the trial court or, for that matter, of this Court, with respect to the issue of the constitutionality of the Kentucky system of common schools. If a statute (or in this case, a system established by statutes) is not constitutionally valid, the existence or non-existence of a class of litigants is immaterial. The constitutional issue has been raised by the Council, the individual school districts, and by those individual students properly before this Court. The system is no more nor no less susceptible to constitutional challenge because of the lack of a class action. *See, e.g., Bright v. Baesler,* 336 F.Supp. 527 (E.D.Ky.1971); *Kelley v. City of Ashland,* Ky., 562 S.W.2d 312 (1978); *Moormen v. Morgan,* Ky., 285 S.W.2d 146 (1955); *Barker v. Crum,* 177 Ky. 637, 198 S.W. 211 (1917).

While we concur with appellants' contention, the effect of our decision on this legal point is that it is non-dispositive.

## VIII. ARE ALL THE TWENTY–TWO INDIVIDUAL STUDENT PLAINTIFFS BEFORE THE COURT?

▆ This issue is closely akin to the one previously decided. Twenty-two students were named as individual plaintiffs, suing by and through their parents as next friends. None of the parents testified, and only one of the students testified. At trial, reference was made to four student-plaintiffs by another witness.

Appellants argue only the latter five students are properly before this court, and that there is no evidence in the record to show "that either of these five plaintiff-students has individually suffered a violation of his or her constitutional rights."

We have previously declared that the Council and the individual districts are properly before this court. We are not cited any legal authority for the proposition that a party has to testify before he or she is properly before the court, and we know of none. Twenty-two students allege that the Kentucky system of common schools is violative of Section 183. The fact that all of the students did not testify is irrelevant. The constitutional issue presented is clearly before this Court.

## IX. DOES THE COMPLAINT STATE A CLAIM AGAINST THE TWO LEGISLATOR–APPELLANTS?

The remaining appellants in this action are State Senator John A. Rose, who is President *Pro Tempore* of the Senate, and Representative Donald J. Blandford, who is Speaker of the House of Representatives.

Appellants argue that the declaratory judgment is a nullity against them. They claim that all 138 members of the Kentucky General Assembly would have to be joined as parties-defendant for the relief granted to be valid.

The premises for this argument are as follows: that the essence of the trial court's decision is that the financing of the system of common schools by the General Assembly is inadequate; and it is the entire General Assembly which will be required to raise more money for the system. Additionally, appellants maintain that since the General Assembly is not a corporate body, and since the appellants are not authorized to accept service for the entire membership, the court is not empowered in this action to direct the General Assembly to take any action. Lastly, appellants contend that the trial court's retention of continuing supervision through an "open-end" type of jurisdiction will lead to the court improperly attempting to direct the actions of the General Assembly.

The trial court did, as claimed, keep a type of open-end jurisdiction or supervision of the matter. As will be seen *infra,* we believe this to be improper.

Regarding appellants' other assertions we believe that the appellants do not correctly interpret the trial court's judgment, and moreover, we believe that the General Assembly, as a legislative body, is properly before this Court.

To begin with, the issue decided by the trial court, is that the system of common schools of the Commonwealth is not efficient, and is not constitutionally valid. The trial court set out numerous standards by which an "efficient system" can be judged. We do the same. The trial court emphasized and re-emphasized, in its three documents, that it was not directing the General Assembly to enact specific legislation and that it was not directing the General Assembly to raise taxes. We do the same.

▆ The impact of this decision that the system is constitutionally deficient will be to set certain standards that we believe are required by Section 183 for the establishment and maintenance of an efficient system of common schools. It will be the responsibility of the General Assembly, using its own judgment and exercising its own power and constitutional duty, to establish such a system. Further, the trial court required these two appellants to, in effect, introduce legislation to correct the constitutional defect. We do not agree

with the trial court here, and we do not so order the two legislator-appellants.

■ We do not agree that, in order to bring the Kentucky General Assembly within the jurisdiction of a court, a plaintiff must effect service upon all of the individual members thereof. While we have no Kentucky authority directly on point, we do recognize a line of cases holding that members of lesser administrative and legislative bodies must be named individually as parties-defendant in order to invoke a trial court's jurisdiction. In *Lewis v. Board of Councilmen Of Frankfort*, 305 Ky. 509, 204 S.W.2d 813 (1947), for example, the court affirmed the dismissal of an action for a writ of mandamus. The plaintiff failed to name individual members of the Frankfort Board of Councilmen in the complaint; thus the court determined that the Board was not properly before the court. The court was concerned with affected parties' ability to defend themselves and the court's power to enforce a writ, if granted.

■ While it is certainly true that the named appellants in the instant case cannot, by themselves, enact any legislation, they can defend the constitutionality of an act or acts. They have done so in this case. Furthermore, the trial court did not issue a writ of mandamus and appellants were not ordered to enact *specific legislation*, but to "proceed as rapidly as possible to establish an efficient system of elementary and secondary public schools within the guidelines laid down...."

The two appellants in this case are the elected leaders of the House of Representatives and the Senate. In the Complaint, they are described as follows.

"Defendant, Joseph W. Prather, is President Pro Tempore of Kentucky's Senate. Defendant, Donald J. Blandford, is Speaker of Kentucky's House of Representatives. *Those defendants are the presiding officers and are representative of their respective legislative bodies. They are named in their official capacities as President Pro Tempore of the Kentucky Senate and Speaker of the Kentucky House of Representatives, respectively.*" (emphasis added).

While the legislative leaders are not named as official representatives of the General Assembly in the caption of the complaint, as they should have been, it is clear from the statement of parties contained within the complaint that appellants were in fact named in a representative capacity that is sufficient to indicate the capacity in which they were being sued. *See Beverly v. Highfield*, 307 Ky. 179, 209 S.W.2d 739, 741 (1948).

We are also persuaded by authority from other jurisdictions that further obviates the need for serving all members of a legislative body. In *Seattle School District No. 1 of King County v. State*, 90 Wash.2d 476, 585 P.2d 71 (1978) the Speaker of the House of Representatives was named as a defendant representing all members of the House and the President of the state Senate was likewise named as a defendant representing the entire Senate. In *Barkely v. O'Neill*, 624 F.Supp. 664 (S.D.Ind., 1981) the plaintiff sued members of the United States House of Representatives by suing the Speaker of the House and several members of a special task force. Although the plaintiff lost on the merits, the House was before the court. *See also, Jackson v. Congress of the United States*, 558 F.Supp. 1288 (S.D.N.Y.1983); *cf. Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (both Houses of Congress found to be proper parties as intervenors in a suit challenging the House's exercise of legislative veto); *Synar v. United States*, 626 F.Supp. 1374 (D.D.C.1986) (House Speaker O'Neill and Bipartisan Leadership Group intervened as defendants to support an Act challenged on constitutional grounds), *aff'd, Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986).

As in several of the above cases, the case at bar attacks the constitutionality of an act or series of acts of a legislative body. This case of major statewide importance has been tried and practiced vigorously by all parties and was decided on the merits by the trial court. We will not now initiate useless circuity of action by requiring the cumbersome process of serving all mem-

bers of the General Assembly. *See Bruner v. City of Danville*, Ky., 394 S.W.2d 939, 941 (1965). We believe it is only common sense and practical to hold that service on both the President *Pro Tempore* of the Senate and the Speaker of the House of Representatives, named in their respective capacities is sufficient to acquire jurisdiction over the General Assembly in this action.

## X. WHAT IS AN "EFFICIENT SYSTEM OF COMMON SCHOOLS"?

■ In a few simple, but direct words, the framers of our present Constitution, set forth the will of the people with regard to the importance of providing public education in the Commonwealth.

> *"General Assembly to provide for school system—*The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." Ky. Const. Sec. 183.

Several conclusions readily appear from a reading of this section. First, it is the obligation, the sole obligation, of the General Assembly to provide for a system of common schools in Kentucky. The obligation to so provide is clear and unequivocal and is, in effect, a constitutional mandate. Next, the school system must be provided throughout the entire state, with no area (or its children) being omitted. The creation, implementation and maintenance of the school system must be achieved by appropriate legislation. Finally, the system must be an efficient one.

It is, of course, the last "conclusion" that gives us pause and requires study and analysis. What, indeed, is the meaning of the word "efficient" as used in Section 183?

## THE CONSTITUTIONAL DEBATES

■ A brief sojourn into the Constitutional debates will give some idea—a contemporaneous view—of the depth of the delegates' intention when Section 183 was drafted and eventually made its way into the organic law of this state. It will pro-

vide a background for our definition of "efficient."

Comments of Delegate Beckner on the report which led to the selection of the language in Section 183 reflect the framers' cognizance of the importance of education and, emphasized that the educational system in Kentucky must be improved. Referring to the education of our children, he admonished the delegates, "do not let us make a mistake in dealing with the most vital question that can come before us." III *Debates Constitutional Convention 1890* 4459 [hereinafter *Debates* ].

After summarizing other achievements made in the proposed new Constitution he continued—

> "If, however, after accomplishing so much good on these lines—we forget the children, and, in the slightest degree, fail to appreciate the obligations of the State to provide sufficient facilities for training them to be good citizens, we will deserve and receive in the great hereafter anathema, and not ascription of praise." *Id.* at 4460.

Incorporating a report made to the Kentucky legislature in 1822, Beckner quoted (referring to a system of common schools):

> " '. . . It is a system of practical equality in which the children of the rich and poor meet upon a perfect level and the only superiority is that of the mind.' " *Id.* at 4460.

Beckner further declared, "Instruction of children under the auspices of the State has become the settled policy of our people." *Id.* at 4461.

Beckner set out four permanent justifications for and characteristics of state provided schools:

1) The education of young people is essential to the prosperity of a free people.

2) The education should be universal and should embrace all children.

3) Public education should be supervised by the State, to assure that students develop patriotism and understand our government.

4) Education should be given to all—rich and poor—so that our people will be homogeneous in their feelings and desires.

*Id.* at 4462–63.

One final passage merits quotation. Since education provided by the State is no longer an open question, the only thing that remains is how it shall be made "most valuable and effective." Let Mr. Beckner's answer be a guidepost for all Kentuckians today and in the future:

"If public schools have come to stay, if they are a part and parcel of our free institutions, woven into the very web and woof of popular government; and if they are in the future to be the dependence of the people of Kentucky for the instruction of their youth, what is the logic of the situation? Manifestly to encourage and improve them, *to seize every opportunity to make them more efficient*, to treat them with no niggard or stinted hand, but just in so far as we love our children, to try to make their training-places fit nurseries of immortal spirits that have divine purposes to fulfill on earth, and cannot hope to succeed, unless their intellectual powers be properly developed." *Id.* at 4463 (emphasis added).

As if these powerful words were not sufficient to show the purpose of Section 183, consider those of delegate Moore—

"Common schools make patriots and men who are willing to stand upon a common land. The boys of the humble mountain home stand equally high with those from the mansions of the city. There are no distinctions in the common schools, *but all stand upon one level.*" *Id.* at 4531 (emphasis added).

It serves no purpose to further lengthen this opinion with more verbiage from the Constitutional debates. Delegates Beckner and Moore told their fellow delegates and have told us, what this section means.

—The providing of public education through a system of common schools by the General Assembly is the most "vital question" presented to them.

—Education of children must not be minimized to the "slightest degree."

—Education must be provided to the children of the rich and poor alike.

—Education of children is essential to the prosperity of our state.

—Education of children should be supervised by the State.

—There must be a constant and continuing effort to make our schools more efficient.

—We must not finance our schools in a *de minimis* fashion.

—All schools and children stand upon one level in their entitlement to equal state support.

This Court, in defining efficiency must, at least in part, be guided by these clearly expressed purposes. The framers of Section 183 emphasized that education is essential to the welfare of the citizens of the Commonwealth. By this animus to Section 183, we recognize that education is a fundamental right in Kentucky.

## LEGAL PRECEDENTS IN KENTUCKY

Although the Court did not specifically comment on Section 183 in *Major v. Cayce*, 98 Ky. 357, 33 S.W. 93 (1895), it did state the essential requirements of a statute which the General Assembly enacted in compliance with that constitutional provision.

"[U]nder the school law the pupils, all within the age and resident in the district, are entitled to attend these common schools, and to receive tuition in all the branches [of learning] prescribed by the state board of education to be taught therein, free of expenses ..." 33 S.W. at 94.

This decision, very close in time to the adoption of the present Constitution, recognized a prohibition against any practice which "impairs the equal benefit of the common-school system" to all students. *Id.* at 95.

In *City of Louisville v. Commonwealth*, 134 Ky. 488, 121 S.W. 411 (1909), the Court held:

"In this state the subject of public education has always been regarded and treated as a matter of state concern. In the last

Constitution, as well as in the one preceding it, *the most explicit care was evinced to promote public education as a duty of the state....*

> In obedience to that requirement, the General Assembly has provided a system of public schools.... All [schools throughout the state] have the one main essential—that they are free schools, open to all the children of proper school age residing in the locality, *and affording equal opportunity for all* to acquire the learning taught in the various common school branches...." 121 S.W. at 412 (emphasis added).

The decision, specifically relying on Section 183, postulated: public education in the common schools is a duty of the state; that the General Assembly attempted to obey the mandate (as it certainly has attempted to do now); and although there are certain different provisions for different localities, *all* common schools must be free, open to all students, and provide equal opportunities for all students to acquire the same education. In other words, although by accident of birth and residence, a student lives in a poor, financially deprived area, he or she is still entitled to the same educational opportunities that those children in the wealthier districts obtain. What principle could be more fair, more just, and more importantly, what would be more consistent with the purpose of Section 183 and the common school system it spawned?

We further emphasized the mandate of Section 183 in *Board of Education of Boyle County v. McChesney*, 235 Ky. 692, 32 S.W.2d 26 (1930). Affirming the General Assembly's constitutional duty to provide for an efficient system, the Court idealistically observed the citizens' burden.

> "Onerous taxes are levied annually and paid willingly by the people for this essential governmental service." 32 S.W.2d at 28.

In the case of *Commonwealth ex rel. Baxter v. Burnett*, 237 Ky. 473, 35 S.W.2d 857 (1931), we again emphasized the constitutional mandate of Section 183, and the great importance of public education. In addition, the element of "efficiency" was highlighted. The Court also acknowledged and approved strong, centralized control (by the state) of the system of common schools.

> "In the progress towards the highest degree of efficiency the legislature more and more has centralized the control of schools and sought uniformity and equality of advantage for the school children of the state as a whole." 35 S.W.2d at 859.

Describing the growing centralization as "progress," we restated the overall goals of the system as "uniformity and equality" for the school children of the state "as a whole." What could be clearer? Since the Constitution acknowledges the importance of education to this Commonwealth and since the establishment and maintenance of a system of common schools is a mandated duty of the General Assembly, it is part and parcel of this overall goal that the system have the twin attributes of uniformity and equality.

In *Wooley v. Spalding*, Ky., 293 S.W.2d 563 (1956), a suit was filed by citizens and taxpayers to prohibit the defendant superintendent of Marion County schools from expending funds in alleged illegal ways, to prohibit sectarian instruction from being given in public schools and to seek the reopening and proper operation of a high school. The trial court denied the request, but our predecessor Court reversed and granted the requested injunction. In language which brings together and re-emphasizes earlier decisions, we said,

> "The fundamental mandate of the Constitution and Statutes of Kentucky is that there shall be equality and that all public schools shall be nonpartisan and nonsectarian.
>
> Uniformity does not require equal classification but it does demand that there shall be a substantially uniform system and equal school facilities without discrimination as between different sections of a district or a county." *Id.* at 565 (references omitted).

The lack of uniformity and the unequal educational opportunity existing in the county was said to constitute "a violation

of both the spirit and intent of Section 183 of our State Constitution." *Id.* That reasoning therein applies, *a fortiori*, to the entire state system of common schools. Public schools must be efficient, equal and substantially uniform.

As can be seen, this Court, since the adoption of the present Constitution, has, in reflecting on Section 183, drawn several conclusions:

1) The General Assembly is mandated, is duty bound, to create and maintain a system of common schools—throughout the state.

2) The expressed purpose of providing such service is vital and critical to the well being of the state.

3) The system of common schools must be efficient.

4) The system of common schools must be free.

5) The system of common schools must provide equal educational opportunities for all students in the Commonwealth.

6) The state must control and administer the system.

7) The system must be, if not uniform, "substantially uniform," with respect to the state as a whole.

8) The system must be equal to and for all students.

Finally, a Federal Court has stated the financial burden entailed in meeting these responsibilities in no way lessens the constitutional duty. *Carroll v. Board of Education of Jefferson County*, 410 F.Supp. 234 (W.D.Ky.1976), *aff'd* 561 F.2d 1 (6th Cir.1977).

"In short, once the citizens of Kentucky made the voluntary commitment to educate the children of this state in public schools neither the Kentucky General Assembly nor those individuals responsible for discharging the duties imposed on them by the state constitution ... can abrogate those duties merely because the monetary obligations becomes unexpectedly large or onerous." *Id.* at 238. The taxpayers of this state must pay for the system, no matter how large, even to the point of being "unexpectedly large or even onerous."

Before proceeding, therefore, to a definition of "efficient" we must address a point made by the appellants with respect to our authority to enter this fray and to "stick our judicial noses" into what is argued to be strictly the General Assembly's business.

■ Appellants argue and cite several cases to support their position, that the General Assembly has sole and exclusive authority to determine whether the system of common schools is constitutionally "efficient" and that a Court may not substitute its judgment for that of the General Assembly.

In *Prowse v. Board of Education for Christian County*, 134 Ky. 365, 120 S.W. 307 (1909), the constitutionality of an act requiring the fiscal court to enact a tax previously set by the board of education for local school operation was upheld. We said, in light of Section 183:

"What system will be most efficient is for the judgment of the General Assembly.... In a matter like this, resting within the discretion of the General Assembly, the Court will not substitute its judgment for the judgment of the General Assembly and it will not interfere with the action of the legislature, unless a palpable effort to evade the mandate of the Constitution should appear." 120 S.W. at 308.[17]

**17.** *See also, Board of Education of Louisville v. Board of Education of Jefferson County*, Ky., 458 S.W.2d 6, 8 (1970) (determining whether legislation is appropriate is legislative function); *City of Louisville v. Board of Education*, 302 Ky. 647, 195 S.W.2d 291, 293 (1946) (General Assembly has authority "to deal with the common schools in any way it should desire"); *Commonwealth v. Griffen*, 268 Ky. 830, 105 S.W.2d 1063, 1065 (1937) (lawmakers have "wide latitude." "What that system is is ... left wholly to the discretion of the Legislature."); *Madison County Board of Education v. Smith*, 250 Ky. 495, 63 S.W.2d 620, 621 (1933) ("legislative discretion the best method of providing for an efficient system of common schools."); *Elliott v. Garner*, 140 Ky. 157, 130 S.W. 997, 998 (1910) (how General Assembly shall best accomplish efficient system of common schools "is purely a matter of legislative discretion").

It is textbook law that enactments of the General Assembly have a strong presumption of constitutionality. *Jefferson County Police Merit Board v. Bilyeu*, Ky., 634 S.W.2d 414 (1982). It is also a textbook law that where legislative discretion is present, the judiciary will be reluctant to interfere. *See, e.g., American Insurance Association v. Geary*, Ky., 635 S.W.2d 306 (1982). The separation of powers doctrine of the Kentucky Constitution underpins and buttresses these legal theories. Ky. Const. Sec. 27, 28, 29; *Legislative Research Commission v. Brown*, Ky., 664 S.W.2d 907 (1984).

In this context, we review the question before us. The ultimate issue is whether the system of common schools in the Commonwealth established by the General Assembly, with respect to the mandate of Section 183, is in compliance with the constitution. Specifically, we are asked—based solely on the evidence in the record before us—if the present system of common schools in Kentucky is "efficient" in the constitutional sense. It is our sworn duty, to decide such questions when they are before us by applying the constitution. The duty of the judiciary in Kentucky was so determined when the citizens of Kentucky enacted the social compact called the Constitution and in it provided for the existence of a third equal branch of government, the judiciary.

The issue before us—the constitutionality of the system of statutes that created the common schools—is the only issue. To avoid deciding the case because of "legislative discretion," "legislative function," etc., would be a denigration of our own constitutional duty. To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.

We believe that what these several cases cited as controlling by appellants mean is that great weight should be given to the decision of the General Assembly. We believe they mean that the presumption of

constitutionality is substantial. We believe that they mean that legislative discretion—in this specific matter of common schools—is to be given great weight and, we do so in this decision. We do not question the wisdom of the General Assembly's decision, only its failure to comply with its constitutional mandate. In so doing, we give deference and weight to the General Assembly's enactments; however, we find them constitutionally deficient.[18]

The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to so do. This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.

### OTHER AUTHORITY

In our sister and adjoining state of West Virginia, the state Constitution requires that

"The legislature shall provide, by general law, for a thorough and efficient system of free schools." W.Va. Const, Art. XII, Sec. 1.

In the landmark case of *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979) the West Virginia Supreme Court faced a lawsuit similar to the one before us. The trial court found that one county's school system was inadequate, in comparison with four other local systems. Although the West Virginia Supreme Court remanded the case for further evidentiary hearings it courageously spoke out in defining the "thorough and efficient" clause of Section 1 of its constitution.

The Court engaged in extensive historical analysis, in which it carefully interpreted other states' constitutional mandates

18. This Court did, in fact, address the constitutionality of a statute under the mandate of Section 183 in *Trustees of Graded Free Colored Common Schools v. Trustees of Graded Free White Common Schools*, 180 Ky. 574, 203 S.W. 520 (1918).

with regard to public education.[19] The court rejected the contention that legislative discretion in public school system matters is determinative.

"So, on the threshold question: no court has been hesitant to affirm legislation; many have required specific actions by local boards to bring them to compliance with the constitutional mandate; and legislation has been declared unconstitutional because it failed the mandate. *There is ample authority that courts will enforce constitutionally mandated education quality standards.*" *Id.* at 874 (emphasis added).

In turning to the definition of "efficient" the Court, began with definition which was "lexically" founded.

"... (T)he mandate, ... becomes a command that the education system be absolutely complete, attentive to every detail, extending beyond ordinary parameters, and further, it must produce results without waste." *Id.* at 874.

Following an analysis of the admitted plethora of legal precedent, the West Virginia Supreme Court adopted a definition of "thorough and efficient."

"[8] We may now define a thorough and efficient system of schools: It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically." *Id.* at 877.

The court continued by recognizing areas in which each child educated in the system should develop to full capacity: 1) literacy; 2) mathematical ability; 3) knowledge of government sufficient to equip the individual to make informed choices as a citizen; 4) self-knowledge sufficient to intelligently choose life work; 5) vocational or advanced academic training; 6) recreational pursuits; 7) creative interests; 8) social ethics. Support services, such as good physical facilities and instructional resources, and state and local monitoring for waste and incompetency were considered to be implicit in the definition of "a thorough and efficient system." *Id.*

We cite *Pauley*, and quote from it at some length to show that Courts may, should and have involved themselves in defining the standards of a constitutionally mandated educational system.[20]

We consider foreign cases, along with our constitutional debates, Kentucky precedents and the opinion of experts in formulating the definition of "efficient" as it appears in our Constitution.

## OPINIONS OF EXPERTS

Numerous well-qualified experts testified in this case. They were all well educated, experienced teachers, educators, or administrators; and all were familiar with the Kentucky system of common schools and with other states' and national school issues.

Dr. Richard Salmon testified that the concept of efficiency was a three part concept. First, the system should impose no financial hardship or advantage on any group of citizens. Further, local school districts must make comparable tax efforts. Second, resources provided by the system must be adequate and uniform throughout the state. Third, the system must not waste resources.

Dr. Kern Alexander opined that an efficient system is one which is unitary. It is one in which there is uniformity throughout the state. It is one in which equality is a hallmark and one in which students must be given equal educational opportunities, regardless of economic status, or place of

---

**19.** We recommend a study of this opinion for those who are interested in the historical background of similar constitutional provisions. We are persuaded that the history and reasoning expressed in the *Pauley* case is applicable and persuasive in the decision of the case before us.

**20.** We invite the interested reader to consider cases in other jurisdictions, which have been instructive and helpful to us. See also *Dupree v. Alma School District No. 30 of Crawford County, et al.,* 279 Ark. 340, 651 S.W.2d 90 (1983); *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977); *Robinson v. Cahill,* 69 N.J. 449, 355 A.2d 129 (1976); *Washakie County School District v. Herschler,* 606 P.2d 310 (Wyo.1980).

residence. He also testified that "efficient" involves pay and training of teachers, school buildings, other teaching staff, materials, and adequacy of all educational resources. Moreover, he, like Dr. Salmon, believed that "efficient" also applies to the quality of management of schools. Summarizing Dr. Alexander's opinion, an efficient system is unitary, uniform, adequate and properly managed.

The definitions of "efficient" were documented and supported by numerous national and local studies, prepared and authorized by many of the giants of the education profession.

■ The primary expert for the appellees was a local school superintendent who felt that an efficient system is one which is operated as best as can be with the money that was provided. We reject such a definition which could result in a system of common schools, efficient only in the uniformly deplorable conditions it provides throughout the state.

In summary the experts in this case believed that an "efficient" system of common schools should have several elements:

1) The system is the sole responsibility of the General Assembly.
2) The tax effort should be evenly spread.
3) The system must provide the necessary resources throughout the state—they must be uniform.
4) The system must provide an adequate education.
5) The system must be properly managed.

DEFINITION OF "EFFICIENT"

We now hone in on the heart of this litigation. In defining "efficient," we use all the tools that are made available to us. In spite of any protestations to the contrary, we do not engage in judicial legislating. We do not make policy. We do not substitute our judgment for that of the General Assembly. We simply take the plain directive of the Constitution, and, armed with its purpose, we decide what our General Assembly must achieve in complying with its solemn constitutional duty.

Any system of common schools must be created and maintained with the premise that education is absolutely vital to the present and to the future of our Commonwealth. As Herbert Spencer observed, "Education has for its object the formation of character." H. Spencer, *Social Studies* pt. 1, ch. 2, p. 17 (1851). No tax proceeds have a more important position or purpose than those for education in the grand scheme of our government. The importance of common schools and the education they provide Kentucky's children cannot be overemphasized or overstated.

■ The sole responsibility for providing the system of common schools is that of our General Assembly. It is a duty—it is a constitutional mandate placed by the people on the 138 members of that body who represent those selfsame people.

The General Assembly must not only establish the system, but it must monitor it on a continuing basis so that it will always be maintained in a constitutional manner. The General Assembly must carefully supervise it, so that there is no waste, no duplication, no mismanagement, at any level.

■ The system of common schools must be adequately funded to achieve its goals. The system of common schools must be substantially uniform throughout the state. Each child, *every child,* in this Commonwealth must be provided with an equal opportunity to have an adequate education. Equality is the key word here. The children of the poor and the children of the rich, the children who live in the poor districts and the children who live in the rich districts must be given the same opportunity and access to an adequate education. This obligation cannot be shifted to local counties and local school districts.

As we have indicated, Section 183 requires the General Assembly to establish a system of common schools that provides an equal opportunity for children to have an adequate education. In no way does this constitutional requirement act as a limita-

tion on the General Assembly's power to create local school entities and to grant to those entities the authority to supplement the state system. Therefore, if the General Assembly decides to establish local school entities, it may also empower them to enact local revenue initiatives to supplement the uniform, equal educational effort that the General Assembly must provide. This includes not only revenue measures similar to the special taxes previously discussed, but also the power to assess local ad valorem taxes on real property and personal property at a rate over and above that set by the General Assembly to fund the statewide system of common schools.[21] Such local efforts may not be used by the General Assembly as a substitute for providing an adequate, equal and substantially uniform educational system throughout this state.

Having declared the system of common schools to be constitutionally deficient, we have directed the General Assembly to recreate and redesign a new system that will comply with the standards we have set out. Such system will guarantee to all children the opportunity for an adequate education, through a *state* system. To allow local citizens and taxpayers to make a supplementary effort in no way reduces or negates the minimum quality of education required in the statewide system.

We do not instruct the General Assembly to enact any specific legislation. We do not direct the members of the General Assembly to raise taxes. It is their decision how best to achieve efficiency. We only decide the nature of the constitutional mandate. We only determine the intent of the framers. Carrying-out that intent is the duty of the General Assembly.

■ A child's right to an adequate education is a fundamental one under our Constitution. The General Assembly must protect and advance that right. We concur

with the trial court that an efficient system of education must have as its goal to provide each and every child with at least the seven following capacities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market.[22]

■ The essential, and minimal, characteristics of an "efficient" system of common schools, may be summarized as follows:

1) The establishment, maintenance and funding of common schools in Kentucky is the sole responsibility of the General Assembly.

2) Common schools shall be free to all.

3) Common schools shall be available to all Kentucky children.

4) Common schools shall be substantially uniform throughout the state.

5) Common schools shall provide equal educational opportunities to all Kentucky children, regardless of place of residence or economic circumstances.

21. See text on page 216.

22. In recreating and redesigning the Kentucky system of common schools, these seven characteristics should be considered as *minimum* goals in providing an adequate education. Certainly, there is no prohibition against higher

goals—whether such are implemented statewide by the General Assembly or through the efforts of any local education entities that the General Assembly may establish—so long as the General Assembly meets the standards set out in this Opinion.

6) Common schools shall be monitored by the General Assembly to assure that they are operated with no waste, no duplication, no mismanagement, and with no political influence.

7) The premise for the existence of common schools is that all children in Kentucky have a constitutional right to an adequate education.

8) The General Assembly shall provide funding which is sufficient to provide each child in Kentucky an adequate education.

9) An adequate education is one which has as its goal the development of the seven capacities recited previously.

## XI. IS THE PRESENT SYSTEM "EFFICIENT"?

■ We have described, *infra,* in some detail, the present system of common schools. We have noted the overall inadequacy of our system of education, when compared to national standards and to the standards of our adjacent states. We have recognized the great disparity that exists in educational opportunities throughout the state. We have noted the great disparity and inadequacy, of financial effort throughout the state.

In spite of the past and present efforts of the General Assembly, Kentucky's present system of common schools falls short of the mark of the constitutional mandate of "efficient." When one juxtaposes the standards of efficiency as derived from our Constitution, the cases decided thereunder, the persuasive authority from our sister states and the opinion of experts, with the virtually unchallenged evidence in the record, no other decision is possible.

## XII. DID THE TRIAL COURT'S JUDGMENT VIOLATE THE SEPARATION OF POWERS PROVISION OF THE KENTUCKY CONSTITUTION?

Appellants assert that the trial court's judgment violates the separation of powers doctrine in that it exceeded the authority of the court in "dictating" to the General Assembly, and it exceeded the authority of the court by creating a type of open-ended

judgment which required legislator-defendants to report their progress to the trial court.

Our constitutional provisions which relate to separation of powers between the three separate and independent branches of government were authored by Thomas Jefferson. They are as follows:

"Sec. 27. The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of the magistracy, to-wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."

"Sec. 28. No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

Section 29 vests the legislative power in the General Assembly, and Section 109 grants the judicial power to the Court of Justice.

Because of the specific wording of the Constitution, we have previously noted the strength of the separation of powers doctrine in this state:

"Our present Constitution contains explicit provisions which, on one hand, *mandate* separation among the the three branches of government, and on the other hand, specifically *prohibit* incursion of one branch of government into the powers and functions of the other. Thus, our constitution has a double-barreled, positive-negative approach...." *Legislative Research Commission v. Brown,* Ky., 664 S.W.2d 907, 912 (1984) (emphasis added).

Moreover, in *Brown,* we reiterated that the doctrine of separation of powers must be "strictly construed." *Id.*

Simply stated, we have declared that the power to legislate belongs to the General Assembly, and the power to adjudicate belongs to the judiciary. It is our goal to honor both the letter and spirit of that constitutional mandate.

"Our functions are to determine the constitutional validity and to declare the meaning of what the legislative department has done. We have no other concern." *Johnson v. Commonwealth*, 291 Ky. 829, 165 S.W.2d 820, 825 (1942).

With these principles to guide us, we now address appellants' contentions.

■ It is argued that the trial court directed the General Assembly to enact specific legislation and to raise taxes and that such is a violation of the separation of powers. We do not agree that that is what the judgment of the trial court does. The trial judge did define "efficient," he did declare that a common school education is a fundamental constitutional right in this state, and he did say that any educational system to be "efficient," must have certain characteristics. He commented on the possible methods of financing the system of common schools in Kentucky and did, of course, opine that additional money would be required. This later conclusion was based on an abundance of virtually uncontested and unchallenged evidence in this record.

Moreover, the trial judge specifically denied that he was directing the General Assembly to enact any *specific legislation*, including raising taxes. His mandate to the General Assembly was to bring the system of common schools into compliance with Section 183 of our Constitution. He did as we have done, established certain criteria, standards and goals which must be met to so comply. It is clear that the specifics of the legislation will be left up to the wisdom of the General Assembly. Clearly, no "legislating" is present in the decision of the trial court, and more importantly, as we have previously said, there is none present in the decision of this Court. We do not agree with appellants.

■ However, we agree with appellants that the decision of the trial court to require the appellants to report to him on their progress is a clear incursion, by the judiciary, of the functions of the legislature.

The implications of such an open-ended judgment are very clear. The trial court retains jurisdiction and supervision of the General Assembly's effort to provide a constitutional system of common schools. Under such an order, the General Assembly, in theory if not in practice, would literally have to confer, report, and comply with the judge's view of the legislation proposed to comply with the order. The legislation would be that of the joint efforts of the General Assembly and the trial court, with the latter having the final word. This is, without doubt, the type of action that was eschewed when the framers of the four constitutions of this state placed the separation of powers doctrine in the organic law of this state.

Our job is to determine the constitutional validity of the system of common schools within the meaning of the Kentucky Constitution, Section 183. We have done so. We have declared the system of common schools to be unconstitutional. It is now up to the General Assembly to re-create, and re-establish a system of common schools within this state which will be in compliance with the Constitution. We have no doubt they will proceed with their duty.

The enactments of the General Assembly, in this subject area, or in any area, is always subject to the scrutiny of the Court of Justice, under the authority described in *Brown, supra*, and *Johnson, supra*.

One last point must be disposed of. We are referred by appellees to several federal cases where federal courts maintained continuing supervision over its own order—e.g., supervision of prisons, court ordered busing, etc. The United States Constitution has no separation of powers provision within it. The separation of powers doctrine in the Federal area, has been recognized in federal common law. We on the other hand, are faced with a strongly written, definitive constitutional scheme. We must, perforce, follow our constitution. The federal cases and situations referred to are clearly not even persuasive here.

We reverse the decision of the trial court with respect to the requirement that the General Assembly, or any of the defen-

dants in the trial court, further report to the trial court.

### XIII. DID THE TRIAL COURT ERR IN DIRECTING THE DEPARTMENT OF EDUCATION TO PAY THE EXPENSES OF THE SELECT COMMITTEE?

 We find no authority that would justify the appointment of the "special committee" which was to advise the trial court. While the purpose of the committee was undoubtedly an admirable one, and while the members of the committee did an excellent job, their work product essentially is not a proper tool in the formulation of a judicial decision. A judge must make his or her own decision, and must use only the evidence in the record, and the available legal precedents. A judge may not delegate part of his or her authority to non-judicial persons or institutions. We therefore hold the appointment of the committee was improper, and, obviously the assessment of the committee expenses against the Board of Education was improper as well.

### SUMMARY/CONCLUSION

We have decided this case solely on the basis of our Kentucky Constitution, Section 183. We find it unnecessary to inject any issues raised under the United States Constitution or the United States Bill of Rights in this matter. We decline to issue any injunctions, restraining orders, writs of prohibition or writs of mandamus.

We have decided one legal issue—and one legal issue only—viz., that the General Assembly of the Commonwealth has failed to establish an efficient system of common schools throughout the Commonwealth.

Lest there be any doubt, the result of our decision is that Kentucky's *entire system* of common schools is unconstitutional. There is no allegation that only part of the common school system is invalid, and we find no such circumstance. This decision applies to the entire sweep of the system— all its parts and parcels. This decision applies to the statutes creating, implementing and financing the *system* and to all regulations, etc., pertaining thereto. This decision covers the creation of local school districts, school boards, and the Kentucky Department of Education to the Minimum Foundation Program and Power Equalization Program. It covers school construction and maintenance, teacher certification—the whole gamut of the common school system in Kentucky.

While individual statutes are not herein addressed specifically or considered and declared to be facially unconstitutional, the statutory system as a whole and the interrelationship of the parts therein are hereby declared to be in violation of Section 183 of the Kentucky Constitution. Just as the bricks and mortar used in the construction of a schoolhouse, while contributing to the building's facade, do not ensure the overall structural adequacy of the schoolhouse, particular statutes drafted by the legislature in crafting and designing the current school system are not unconstitutional in and of themselves. Like the crumbling schoolhouse which must be redesigned and revitalized for more efficient use, with some component parts found to be adequate, some found to be less than adequate, statutes relating to education may be reenacted as components of a constitutional system if they combine with other component statutes to form an efficient and thereby constitutional system.

 Since we have, by this decision, declared the system of common schools in Kentucky to be unconstitutional, Section 183 places an absolute duty on the General Assembly to re-create, re-establish a new system of common schools in the Commonwealth. As we have said, the premise of this opinion is that education is a basic, fundamental constitutional right that is available to all children within this Commonwealth. The General Assembly should begin with the same premise as it goes about its duty. The system, as we have said, must be efficient, and the criteria we have set out are binding on the General Assembly as it develops Kentucky's new system of common schools.

█ As we have previously emphasized, the *sole responsibility* for providing the system of common schools lies with the General Assembly. If they choose to delegate any of this duty to institutions such as the local boards of education, the General Assembly must provide a mechanism to assure that the ultimate control remains with the General Assembly, and assure that those local school districts also exercise the delegated duties in an efficient manner.

█ The General Assembly must provide adequate funding for the system. How they do this is their decision. However, if ad valorem taxes on real and personal property are used by the General Assembly as part of the financing of the redesigned state system of common schools, the General Assembly has the obligation to see that *all such property* is assessed at 100% of its fair market value. *Russman v. Luckett*, Ky., 391 S.W.2d 694 (1965). Moreover, because of the great disparity of local tax efforts in the present system of common schools, the General Assembly must establish a uniform *tax rate* for such property. In this way, all owners of real and personal property throughout the *state* will make a comparable effort in the financing of the state system of common schools.

This decision has not been reached without much thought and consideration. We do not take our responsibilities lightly, and we have decided this case based on our perception and interpretation of the Kentucky Constitution. We intend no criticism of any person, persons or institutions. We view this decision as an opportunity for the General Assembly to launch the Commonwealth into a new era of educational opportunity which will ensure a strong economic, cultural and political future.

█ Because of the enormity of the task before the General Assembly to recreate a new statutory system of common schools in the Commonwealth, and because we realize that the educational process must continue, we withhold the finality of this decision until 90 days after the adjournment of the General Assembly, *sine die*, at its regular session in 1990.

COMBS, GANT, LAMBERT and WINTERSHEIMER, JJ., concur.

GANT and WINTERSHEIMER, JJ., file separate concurring opinions.

LEIBSON and VANCE, JJ., file separate dissenting opinions.

GANT, Justice, concurring.

I concur in that portion of the majority's decision which holds that the Kentucky General Assembly has failed to comply with Section 183 of the Kentucky Constitution and has not provided for "an efficient system of common schools throughout the State." [1] The majority accurately acknowledges that this Court has a *constitutional duty* to make such a holding. However, the Court's *constitutional duty* is not fulfilled merely by declaring that the common school system in Kentucky is constitutionally deficient. This Court must take the additional step of directing the Trial Court to issue appropriate writs to compel correction of this constitutional deficiency.

The Governor, the Superintendent of Public Instruction, and members of the State Board of Education and General Assembly, all of whom are parties to this litigation, swore to "support the Constitution of the United States and the Constitution of this Commonwealth...." Ky. Const. § 228. The majority finds that the General Assembly has failed to perform a major mandatory duty imposed on it by § 183 of the Constitution, yet it grants appellees no remedy for the grievous wrongs they suffer from this dereliction of duty. To declare the right but withhold a remedy is to shirk the Court's own duty.

It is the province of the courts to protect private rights under the Constitution. Constitutional guaranties would amount to nothing if there was no way to protect

---

1. I also join in the majority's ruling on the procedural issues concerning the parties to this action.

them ... where it is plain that the Constitution has been violated, it is the duty of the courts to say what the law is, and to protect private rights. Otherwise, the Constitution may be disregarded, and power may be exercised by the Legislature in a case where, under the Constitution, it is without power to act at all, while those whose rights are thus destroyed would be left without remedy. *Zimmerman v. Brooks*, 118 Ky. 85, 80 S.W. 443, 447 (1904).

It is well within the power of the courts to issue a writ of mandamus compelling performance of a "plain duty" required by the Constitution. *Wooley v. Spalding*, Ky., 293 S.W.2d 563, 565 (1956).[2] The Governor's obligation to report the findings of this Court to the General Assembly and to call an Extraordinary Session of the General Assembly to rectify the constitutional deficiency in the Commonwealth's school system, and to recommend corrective measure, is such a duty. § 79 of the Kentucky Constitution requires the Governor to "give to the General Assembly information of the state of the Commonwealth, and recommend to their consideration such measures as he may deem expedient." On "extraordinary occasions," the Governor may convene the General Assembly for a Special Session. Ky. Const. § 80. Undoubtedly, a ruling that the entire common school system in Kentucky is constitutionally deficient is such an extraordinary occasion.

Although the Governor's power to convene the General Assembly for an Extraordinary Session is discretionary, Kentucky courts have the authority to compel the exercise of a discretionary duty. *See McKinstry v. Wells*, Ky.App., 548 S.W.2d 169, 174 (1977); *Evans v. Thomas*, Ky., 372 S.W.2d 798, 800 (1963), cert. denied, 376 U.S. 934, 84 S.Ct. 705, 11 L.Ed.2d 653 (1964); *Kaufman v. Humphrey*, Ky., 329 S.W.2d 575, 576 (1959).

In dividing the powers of their government into "legislative, executive and judicial departments," Ky. Const. § 27, the citizens of Kentucky established a government of checks and balances. Each department must play its constitutional role if confrontation and stalemate are to be avoided.

This Court has neither the expertise nor the power to instruct the General Assembly as to how the constitutional deficiency should be corrected. *See McKinstry v. Wells, supra.* Corrective measures are for the executive department to recommend and for the legislative department to adopt.

The majority's description of the magnitude of the problem is well stated: "Kentucky's *entire* system of common schools is unconstitutional." (Emphasis supplied.) The importance and complexity of the task forbids postponing the finality of the Court's decision until the adjournment of the 1990 General Assembly.

The Court must do more than describe, albeit eloquently, the tasks faced by the Executive and Legislative Departments. This decision has provided the Executive and Legislative branches of our government with a rare opportunity to start with a clean slate; to utilize the expertise of its members and others (both inside and outside the state) to study other jurisdictions which have faced a similar problem and successfully solved it; and to stamp a distinguished impression upon the pages of the history of this Commonwealth. Although adequate and additional funding is a necessary part of the contemplated procedure, money alone is not the answer. Efficiency of administration, curriculum, facilities, the ravages of inflation, and many other problems are extant and pleading for cure.

This action should be remanded to the Franklin Circuit Court with direction to immediately issue writs of mandamus requiring the Governor to call an Extraordinary Session of the General Assembly; requiring the Governor, the Superintendent of Public Instruction, and members of the State Board of Education to recommend appropriate corrective measures; and requiring the General Assembly to enact leg-

---

**2.** Therein the Marion County Board of Education was compelled to establish a high school system "that will afford all children in Marion County equal educational opportunities." *Wooley v. Spalding*, 293 S.W.2d at 568 (1956).

islation necessary to bring the Kentucky school system into compliance with § 183 of the Kentucky Constitution.

WINTERSHEIMER, Justice, concurring.

I concur with the majority opinion only to the extent that it holds that an efficient system of common schools has not been provided throughout the state. The General Assembly has not yet succeeded in achieving the constitutional goal directed by Section 183.

I further specifically agree that the majority does not require the General Assembly to pass any law or authorize the adoption of any regulation. All that the General Assembly must do is comply with the constitutional direction to provide, through appropriate legislation, an efficient system of common schools throughout the state. I also agree with the majority that a class action is not properly before this Court. CR 23. I further concur with the opinion to the degree that it does not endorse the so-called Corns plan and that it condemns the use of the committee report and any payments in connection therewith. I concur that this Court does not retain any open-ended continuing jurisdiction.

I agree that the finality of this decision should be withheld because to do otherwise would result in educational chaos to the degree that the system of common schools is unconstitutional. However, I would not give the General Assembly any particular deadline with the understanding that adjournment *sine die* contemplates adjournment without any future date being designated for resumption. This situation can easily be addressed procedurally by the legislature.

I agree with the majority opinion when it cites *Prowse v. Bd. of Education of Christian Co.,* 134 Ky. 365, 120 S.W. 307 (1909), in that a system that will be most efficient is for the judgment of the General Assembly. For similar statements of the law *see City of Louisville v. Board of Education,* 302 Ky. 647, 195 S.W.2d 291 (1946); *Elliott v. Garner,* 140 Ky. 157, 130 S.W. 997 (1910); *Madison County Board of Edu-*

*cation v. Smith,* 250 Ky. 495, 63 S.W.2d 620 (1933). Such a matter is within the sound discretion of the General Assembly, and the Court will not substitute its judgment for that of the legislature and will not interfere with the actions of the legislature.

My principal area of departure from the majority opinion relates to the matter of service on the members of the General Assembly. I do not believe that service on two members of the General Assembly acts as service on the remaining 136 members. The holding of the majority must be strictly limited to the unique circumstances presented in this case.

This action is unique because this Court has not been asked to declare a single act of the legislature unconstitutional. Relief is sought by means of a declaration that the system is unconstitutional because it is not efficient.

Clearly this Court does not have any authority to order the other members of the General Assembly to take any action when they have not been properly summoned before any court or been given an opportunity to be heard in regard to this proceeding. Obviously the two members who have been properly served have presented a comprehensive defense and it would not serve the ends of judicial economy in this voluminous litigation to remand the case solely because of the failure to join the members of the General Assembly individually. I believe this Court can only express an advisory opinion regarding the matter of an efficient system of common schools throughout the state as to the members of the legislature other than Rose and Blandford.

In one sense, too much emphasis has been placed on the role of the legislature in the entire educational framework of the Commonwealth. We must keep in mind that the primary responsibility for the education of children is with the parents. The rights and responsibilities of the parents must always be recognized. The fractured fabric of the family is one of the prime causes for educational failure. Obviously money alone cannot heal such a break.

The lack of scholastic success is not just the fault of the system. Education is a joint venture in which the parents, students and school must be committed to cooperation rather than conflict. As the child advances in age, the educational system must respond by meeting different needs tailored to the specific circumstances of the child. Consequently, the involvement of the state public common school system must be different as needed in each educational situation. Our concern should be primarily focused on the common schools at the primary level.

The circuit court ruling is far too broad and undisciplined as to its conclusions regarding education as a fundamental right. What is a right is what has been promulgated in the 1890 Constitution, that is an efficient system of common schools throughout the state. The majority decision does not order the General Assembly to do anything, however, great care must be taken that independent lawsuits should not be frivilously spawned by such a decision. "Scarcely any political question arises in the United States," Alexis de Tocqueville wrote long ago in *Democracy in America*, "that is not resolved sooner or later, into a judicial question." Proper use of the judicial system is inherent in our system of representative democracy under law, however, great care must be taken to avoid an abuse of the system particularly so that it would not lead to disillusionment and frustration.

Although the majority opinion declares the entire system of education unconstitutional, it should be obvious to any student of government that an overwhelming percentage of the laws now in place must be reenacted by the legislature to provide any form or substance to the system in Kentucky.

The school system is based on many detailed statutes and regulations, none of which have been specifically challenged and many of which have no constitutional impact. Local effort cannot be destroyed; such a conclusion would not be efficient by any definition and is well beyond the scope of the relief sought in this action.

It is beyond question that educational opportunity should be equal for all Kentucky children. The General Assembly has the constitutional responsibility of providing a minimum level of opportunity by establishing an efficient system of common schools throughout the state. Under no circumstances does that mandate preclude local school districts from supplementing the funds received from the state by specific local effort. Although such local taxes may now be considered as state taxes, *Cullinan v. Jefferson County*, Ky. 418 S.W.2d 407 (1967), they should be treated as trust funds and scrupulously attributed to the local district involved. The General Assembly might wish to make such treatment a statutory reality. The total independence and authority of local school districts to supplement any state effort should be carefully preserved.

The only concern we might have is to what specific areas the legislature will change. Such a determination is totally within their authority. It may be that they will properly determine that they must only fine-tune certain aspects of the system. Obviously they should not throw out the good with the bad without careful thought and particular attention to detail. My concern is that the language of the majority is too sweeping when it asserts that the result of the decision is that the entire system of common schools is unconstitutional. We must leave it to the good common sense of the legislature to develop an appropriate system of legislation.

Great care must be taken to differentiate the holding of the majority from dicta that arises from the many words used in the opinion. As an example, references to adequacy, a unitary system and definitions of efficiency are not binding on the General Assembly in any sense.

I concur with the majority in again emphasizing that the sole responsibility for providing a system of efficient common schools throughout the state lies with the General Assembly. That is the sole holding of this case.

VANCE, Justice, dissenting.

I respectfully dissent. I believe the majority opinion is inherently inconsistent in that it says that our system of common schools, to be constitutionally efficient, must provide substantially equal educational opportunity for children throughout the Commonwealth, yet it actually permits the continuation of a system which does not provide substantially equal educational opportunity.

I believe this is so because the opinion expressly holds that individual school districts may continue to levy taxes for school purposes to be used solely within the district.[1] Primarily, it is the levy of these taxes by local school districts, which produces greatly disparate revenues in richer counties than in poorer ones, that has caused the great disparity in school funding per child in the various districts throughout the Commonwealth.

Although there are factors other than the amount of money available per child that must be considered when determining the equality of educational opportunity, I submit that this whole case is predicated upon the proposition that children who reside in districts where the amount of funding available per child is disproportionately less than is available in other districts will be denied an educational opportunity which is equal to the educational opportunity afforded in districts with vastly greater resources.

Because the value of taxable property is so much greater in some districts than others, the continued levy of school taxes for use within individual districts, even if levied at a uniform rate throughout the state and property is assessed at 100 percent of its value, will continue to produce much more revenue in richer counties than in poorer ones. It follows that the continuation of such a tax policy will leave us exactly where we are now, and the school system will not provide substantially equal educational opportunity throughout the Commonwealth, but will in fact, result in better educational opportunity for those who reside in the wealthier sections of the state.

The majority seems to envision that the General Assembly can provide a dually funded educational system, one to be funded by the state which will be applied uniformly throughout the state, the second to be funded locally wherein there is no limit to the amount which local districts can enhance the funding in their district above the level of funding provided by the state. This overlooks the fact that the majority has defined an "efficient" common school system as one which uniformly provides an equal educational opportunity throughout the state. As the majority opinion states, "The children of the poor and the children of the rich, the children who live in the poorer districts and the children who reside in the rich districts must be given the same access to an adequate education." A school system provided by the General Assembly which is funded partially by the state and supplemented by local districts to the extent that it results in any significant difference in funding per child in the richer and poorer districts will not be constitutionally "efficient" under the definition of the term as set forth in the majority opinion.

Although the constitution requires the General Assembly to provide, through appropriate legislation, for an "efficient" system of common schools throughout the Commonwealth, the debates of the delegates to the Constitutional Convention shed very little light upon what the delegates had in mind by the use of the word "efficient." None of the delegates debated the meaning of the word efficient in the sense that it was used.

There was a general agreement among the delegates that common school education should be a state rather than a local

---

1. The taxes levied by local school districts are local in the sense that they are levied upon property within the district, but this court has held on many occasions that these taxes are in fact state taxes which have been authorized by the General Assembly to fulfill the requirements of § 183 of the Kentucky Constitution. *Cullinan v. Jefferson County*, Ky., 418 S.W.2d 407 (1967); *Board of Education v. City of Louisville*, 288 Ky. 656, 157 S.W.2d 337 (1941); *Commonwealth v. Louisville National Bank*, 220 Ky. 89, 294 S.W. 815 (1927).

responsibility. There was much discussion concerning the advantages to children of a common school education and the advantage to the state of having an educated populace.

The primary thrust of the debate went to the equality of educational opportunity; that a system of common schools throughout the state should provide alike for the sons of the poor and the sons of the rich; and provide alike for the children who reside in rural areas as well as for those who reside in centers of population. There was much concern that if education in the common schools throughout the state were not made a constitutional responsibility of the Commonwealth, it would simply become or remain a local matter, and the children of the wealthy and those who reside in the cities would be afforded greater educational opportunity than the children of the poor and those who reside in rural areas. The primary concern was that the opportunity be equal for all children throughout the Commonwealth.

It is because of this universal concern expressed by the delegates to the convention that I conclude that the word "efficient" as used by them must include not only its dictionary definition but must also be construed to include the requirement of substantial equality of educational opportunity.

I do not concur with the majority that the present system of common schools has, on the basis of the record before us, been shown to be *constitutionally* under-funded or inadequate.

While there is a constitutional requirement, I think, as to equality of educational opportunity, I can find no such requirement as to the level of funding. In a sense, of course, any system so inadequately funded that any money put into it is simply a waste of resources is, of necessity, not an efficient system, and to this extent there may be said to be a constitutional mandate as to the minimum level of funding.

During the constitutional debates an amendment was offered to the committee report on education by Mr. Becker, who is quoted in the majority opinion. He offered to amend Section 1 of the committee report to require that the General Assembly provide an *adequate* and efficient system of common schools throughout the Commonwealth. So far as I can determine from reading the constitutional debates, Mr. Becker was the only member of the delegation who spoke in favor of this amendment. His support was hardly fervent. He simply said that in his opinion it would not be inappropriate to require the system of common schools to be "adequate" as well as "efficient." The word "adequate" did not make it into the present constitution, however.

As was noted in the majority opinion, this court has always granted a great degree of deference to the discretion of the General Assembly in the manner of operation of the system of common schools. In *City of Louisville v. Board of Education,* 302 Ky. 647, 195 S.W.2d 291 (1946) we said:

> "Section 183 of the constitution is as broad as it is possible to frame an authority to the legislature to deal with the common schools in any way it should desire."

In *Elliot v. Garner,* 140 Ky. 157, 130 S.W. 997 (1910), we said:

> "The constitution requires the General Assembly to provide an efficient system of common schools throughout the state; and how it shall best accomplish this object is purely a matter of legislative discretion."

Section 183 of the Constitution of Kentucky leaves to the legislative discretion the best method of providing for an efficient system of common schools. *Madison County Board of Education v. Smith,* 250 Ky. 495, 63 S.W.2d 620 (1933). Legislative discretion cannot be extended to such limits as to allow the legislature, in its discretion, to fail to meet its constitutional mandate, but I do not believe it is within the province of this court to interfere with legislative discretion as to the level of school funding unless it clearly appears from the record that the level of funding is so low that it cannot reasonably accomplish basic educational necessities. Not all academic failure is the result of under-funding.

I cannot agree with the majority that the constitution requires the General Assembly to monitor the school system to insure that schools are operated with no waste, mismanagement, or political influence. It is not possible for the General Assembly to oversee the day-to-day operation of schools. In my view, the General Assembly has discharged its duty when it has provided by law for a school system which, if properly administered, will result in substantially equal educational opportunity throughout the Commonwealth. The administration of the school system is not a legislative responsibility, and if the system, because of waste, mismanagement, or political influence, fails in its purpose, the failure is not to be charged to the General Assembly.

Above the minimum level of funding that is constitutionally required for a system of common schools to be efficient, there is room for unlimited enhancement of educational opportunity. The range of this enhancement of educational opportunity above the minimum requirements must be left to the General Assembly. The General Assembly is the representative of the people and is the proper branch of government to determine public policy. The question of how much enhancement there should be of educational opportunity above the minimum requirements is a matter of public policy.

Whether the General Assembly will provide a system of common schools of the highest order or one which barely meets the minimum requirements is a burden which must be placed squarely upon the shoulders of the General Assembly, where the constitution places it. It does not rest with the courts, and indeed the doctrine of separation of powers prohibits judicial interference with legislative prerogative. If we do not exercise restraint in this matter, I fear that every theoretical defect in the educational system will be escalated into litigation to determine the constitutional efficiency of the system.

The system of common schools is created by many statutes, none of which have been directly attacked. Since we have not been asked to declare any statute unconstitutional, I fail to see how we can, in effect, declare them all unconstitutional.

The majority has heaped upon the General Assembly a monumental task with little guidance. It is confronted with a necessity to create a new system of common schools without being told specifically what is wrong with the old one. The majority has not declared any specific statute unconstitutional and, in effect, I think has condoned the continuation of a system which, in all likelihood, will not result in equal educational opportunity throughout the Commonwealth.

There is now imposed a requirement that the system be adequately funded, but no specific standards have been established to determine the adequacy of funding. Instead, it is held that the school system must be funded adequately so as to achieve seven goals, each of which is expressed in the most general terms. Those goals are:

"to provide each and every child with at least the seven following capacities: (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market."

How will the General Assembly be able to know if the legislation it enacts will provide each and every student throughout

the Commonwealth with a sufficient grounding in the arts to enable that student to appreciate his cultural or historical heritage? This goal, like the other seven, is so vague that regardless of what legislation is enacted by the General Assembly the door has been opened for another group or groups of students to sue the General Assembly *ad infinitum,* claiming that in some respects the General Assembly has failed to provide a system of common schools which achieves the seven goals of an efficient system. I fear it will be the courts rather than the General Assembly, which will end up monitoring the common school system.

I am willing to declare, on the basis of this record, that the system of common schools throughout the state does not meet the constitutional imperative of substantially equal educational opportunity for all children. I would go no further. It is the duty of the General Assembly to abide by its constitutional responsibility, but in my opinion, because of the failure to name all of the members of the General Assembly as parties to this action, and to serve them with process or otherwise secure their appearance, we are powerless at this time and in this litigation to mandate any action on the part of the General Assembly or to place the school system in limbo absent some legislative action.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

I agree in principle with the majority's opinion that the General Assembly has failed thus far to, "by appropriate legislation, provide for an efficient system of common schools throughout the State."[1] Ky. Const., § 183. Nevertheless, this case should be reversed and dismissed because it does not present an "actual" or "justiciable" controversy. *See* KRS 418.040; *Black's Law Dictionary,* 5th ed. 1979, p. 777.

An "actual controversy" for purposes of adjudication requires three things: (1) a

justiciable issue (2) involving the legal rights (3) of adverse parties. *Revis v. Daugherty,* 215 Ky. 823, 287 S.W. 28 (1926); *Veith v. City of Louisville,* Ky., 355 S.W.2d 295 (1962).

An actual controversy is one admitting of specific relief through a decree conclusive in character. A judicial pronouncement in the present case where there are public questions of the utmost importance but no such justiciable controversy will cause more problems than it will solve. Worse yet, it opens the doors of the courthouse to a host of new lawsuits by litigants seeking a forum to argue questions of public policy which are incapable of specific judicial resolution. In line with the legal truism that "bad cases make bad law," we can expect this case to be cited as precedent in a new wave of litigation involving issues that should be debated in the forum of public opinion, and then legislated rather than litigated.

To qualify as a judicial controversy the issues must touch legal relationships of parties having adverse legal interests, clearly definable, concrete, and admitting of specific resolution. The Declaratory Judgment Act, KRS 418.040, was never intended for advisory opinions. As the late great wordsmith, Judge Gus Thomas, so aptly said:

> "[C]ontroverted questions are justiciable ones, and ... do [ ] not include abstract legal questions designed merely to furnish information to the inquirer and which, if jurisdiction was taken, would convert courts into a sort of law school for the instruction of the inquisitive mind." *Oldham County v. Arvin,* 244 Ky. 551, 51 S.W.2d 657, 658–59 (1932).

## I. THE PROBLEMS RELATED TO THE ISSUES

*Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), provides a framework for considering the problems related to the issues. First, as to justiciability:

---

1. By "throughout" I do not mean everywhere, but simply *not* in all school districts. For examples to the contrary: Woodford County has been praised as a "model" district; Jefferson County has been recently televised nationally as an example of a successful program.

"[T]he Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." 369 U.S. at 198, 82 S.Ct. at 700.

Then, as to nonjusticiability:

"The nonjusticiability of a political question is primarily a function of the separation of powers. 369 U.S. at 210 [82 S.Ct. at 706].

. . . .

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." 369 U.S. at 217 [82 S.Ct. at 710].

Viewed objectively, the issues in this case fail to qualify under the standards for justiciability in *Baker v. Carr*, falling instead squarely within its description of a nonjusticiable case: there is (1) in our Kentucky Constitution a "textually demonstrable ... commitment of the issue to a coordinate political department," viz., the General Assembly; (2) "a lack of judicially discoverable and manageable standards"; and (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." *Id.*

The case as presented to us neither asks for nor is amenable to specific relief through a decree conclusive in character. The appellees have made it painfully clear throughout that they do *not* want our Court to declare any particular statute or group of statutes unconstitutional, including the system of local school districts, local financing and local administration now in place. Yet, the Majority Opinion decides otherwise:

"Lest there by any doubt, the result of our decision is that Kentucky's *entire system* of common schools is unconstitutional ...—all its parts and parcels.

This decision applies to the statutes creating, implementing and financing the *system* and to all regulations, etc., pertaining thereto. [Emphasis original].

If this verbiage is taken literally, local school districts who are the members of the Council for Better Education, the moving force behind this lawsuit may be eaten up by the monster they created when they invited the courts into the dialogue about how to improve the public school system. The statutes that create them have now been declared unconstitutional. Unable to rationalize an opinion that declares *nothing* unconstitutional, we seem to have declared *everything* unconstitutional.

Elsewhere, the Opinion states that "individual statutes are not herein addressed specifically or considered and declared to be facially unconstitutional." But our "school system" is nothing more and nothing less than the statutes, individually and collectively, structuring its existence and providing for its financing. The system does not exist apart from the statutes, and cannot be declared unconstitutional without specifying which of its components, in whole or in part, make it so.

At oral argument appellees' counsel conceded that, in asking that we declare the system unconstitutional but not the statutes, they were presenting us with a "Gordian" knot. But ask they did, thus presenting us with an insolvable, nonjusticiable dilemma. And, we have responded with what could be expected when you open Pandora's box, an Opinion which at the same time declares everything unconstitutional and nothing unconstitutional. This is more than just a vain act or a bad precedent. This result may well create havoc in the educational process. It adds to the General Assembly's burden in seeking to improve our educational system rather than lightening the load.

The lawsuit filed in Franklin Circuit Court, carefully analyzed, does no more than ask the courts to demand that the Governor and the General Assembly proceed to improve the public school system, specifically by telling the executive and legislative branch to propose and enact new

taxes. While for the most part the trial court's response, like ours, was limited to advice and comments rather than judicial decision-making, its decision went further by granting specific relief in two areas: (1) a mandate to the General Assembly to impose additional new taxes and (2) an order to the President Pro Tempore of the Senate and the Speaker of the House of Representatives to return to Franklin Circuit Court to report on the General Assembly's progress. Both of these, the only concrete or specific "relief" granted, are invalidated by our decision, and rightly so, recognizing they are orders that exceed the power of the judiciary.

As to funding, we state only that "[t]he General Assembly must provide adequate funding for the system. How they do this is their decision."

As to Judge Corns' Order to the leadership of the General Assembly to report to him on its progress, we declare this "a clear incursion, by the judiciary, of the functions of the legislature."

On the other hand, in our Opinion we ordered nothing specific, only that the General Assembly comply with the Constitution, which, of course, it is already duty bound to do.

I say this with one major reservation, because there is one portion of our Opinion that seems to do more than simply encourage the General Assembly to enact legislation to improve the school system. It states:

"[B]ecause of the great disparity of local tax efforts in the present system of common schools, the General Assembly must establish a uniform *tax rate* for such property." [Emphasis original.]

If this sentence means what it says, we have done what we were not asked to do, declare unconstitutional the statutes permitting local school districts to set local tax rates within certain guidelines. Destroying the power presently assigned by statute to local school districts to set local school tax rates may or may not work an improvement. Either way, certainly, it is beyond the scope of the relief sought by the appellees. It is the last thing they would want done, as they have said in no uncertain terms. Yet it is the only thing of a judicial nature that we have decided in our Majority Opinion, and it is beyond the parameters of this lawsuit.[2]

We were only asked to decide one issue in this lawsuit: whether the General Assembly has responded adequately to its constitutional responsibility. This is a political question, pure and simple. We have undertaken to "enter upon policy determinations for which judicially manageable standards are lacking." *Baker v. Carr, supra,* 369 U.S. at 226, 82 S.Ct. at 715. Without such standards, a case is not justiciable. It is not enough to decide that Kentucky does not have an "efficient system of common schools throughout the State," as Section 183 of the Constitution requires, without specifying what statutes are unconstitutional, and why. Yet, the former is not asked, and the latter is not possible. I repeat, this case is not justiciable.

## II. THE PROBLEMS RELATED TO THE PARTIES

Essentially, the plaintiffs comprise two groups, one consisting of sixty-six local school districts represented through the Council for Better Education plus seven more school districts specifically named, and a second consisting of twenty-two public school students suing as individuals.

Turning first to the school districts, it should be obvious from a legal standpoint that these school districts have no authori-

---

**2.** The Response to the Petition for Rehearing filed by the appellee, Council for Better Education, requests us to add this clarification to the Majority Opinion:

"The record in this case clearly shows that no school district in Kentucky is overfunded. No district is funded to the level of the National average. Therefore, to take money from one district and give it to another would be a step toward a mediocre system statewide. This would violate Section 183 of the constitution and would not be approved by this Court."

Perhaps, since we are prepared to enter the political arena, we should be prepared to go this extra mile.

ty to sue the General Assembly, their creator, over the circumstances of their existence. As stated in *Board of Ed. of Louisville v. Board of Ed. of Jefferson County*, Ky., 458 S.W.2d 6, 8–9, (1970), quoted but disregarded in the Majority Opinion:

> "Certainly there are no constitutional guarantees that local school districts, which are purely creatures of the legislature in their creation and alteration, must be regarded by the legislature as autonomous fiefdoms for all purposes, particularly in face of the plenary power vested in the legislature by section 183 of the Constitution of Kentucky as regards the common schools of the state. *Id.* at 8.

This would seem to be conclusive of the matter. But if a case factually to the point is needed, *East Jackson Public Schools v. State*, 133 Mich.App. 132, 348 N.W.2d 303 (1984), should be persuasive. In a suit seeking to declare Michigan's school financing unconstitutional because it produced unequal per student funding between districts, the Michigan court held, *inter alia*, that the school districts did not have standing "to defy their creator over the terms of their existence.... [o]r to expend public funds to finance such litigation." 348 N.W.2d at 306. We should hold the same. Cases from other jurisdictions cited to the contrary, and footnoted in our Majority Opinion, are without exception fundamentally unsound as judicial precedents because they fail to address this question. They also fail to deal with the inherent limitations upon the scope of judicial activity and the constitutional limitations mandated by the doctrine of separation of powers.

The next group of parties-plaintiff is twenty-two students, suing by and through their parents as next friends, who most certainly would have standing to sue, but who had no right to relief unless and until first they pleaded and proved they had been damaged in some specific manner by a named defendant's violation of their constitutional rights. No evidence was presented that such was the case.

Only five of the students were even mentioned in the proof, and only one of these five testified, a ninth grade student in the Dayton Independent School District system who said there were computer courses she would like to take if available, and that only Spanish, not French or Latin, were offered in her school. Certainly this evidence falls short of proving a case on her behalf. There is no evidence at all to sustain the claims of the remaining plaintiffs.

The fundamental error in the trial court, and in our Court, is that the claims of these individual students were treated as a vehicle for a class action on behalf of the entire student body of Kentucky seeking declaratory judgment relief against the General Assembly. The students were given relief of a nature appropriate to a class action, not to the violation of their individual rights. These students never legally represented anybody but themselves. None of the requirements for a class action were followed. Nevertheless, the trial court referred to the students and their parents as "representing as a class all similarly situated students in Kentucky's districts."

Our Majority Opinion acknowledges that the trial court erred, that "there was no class action." But, as in the trial court, in our Majority Opinion the relief granted was of a type appropriate to a class action, but wholly inappropriate to a suit by an individual student seeking a judicial remedy for a specific deprivation of rights. There was no proof supporting their claim as individuals and they had no right to relief as representatives of the class.

The problems with parties-defendant are even more glaring and insurmountable. The case below included as defendants the Governor, the Superintendent of Public Instruction, the State Treasurer, and the State Board of Education, as well as the President Pro Tempore of the Senate and the Speaker of the House of Representatives. The Governor, the Superintendent of Public Instruction, the State Treasurer, and the State Board of Education, although appearing in the suit below, took no appeal from the final judgments, presumably because their authority was not seriously challenged nor were they required to do

anything specific by its terms. John A. Rose, President Pro Tempore of the Senate, and Donald J. Blandford, Speaker of the House of Representatives, are the *only* parties-defendant on this appeal.[3]

The fundamental problem is, of course, how does one sue the General Assembly, a legislative body but not a body corporate, to force them to take action, or to declare unconstitutional their actions or nonactions not embodied in any specific legislation. The General Assembly does not exist as a legal entity apart from its specific legislative acts. Our Majority Opinion cites as authority *Seattle Sch. Dist. No. 1 of King Cty. v. State*, 90 Wash.2d 476, 585 P.2d 71 (1978), but this case never discussed by what authority the legislature of the State of Washington can be sued by naming the Speaker of the House and President of the Senate. On the other hand, the Dissenting Opinion by Justice Rosellini in the State of Washington case, joined by two others, does address the problem:

"The real and only party against whom relief is demanded is the legislature and that body is one which is not amenable to suit.... [T]he people have seen fit to protect the members of their legislature from harassment by litigants while they are in session (Const. art. 2, § 16). [Note: Our Kentucky Constitution does likewise in § 43; see *Wiggins v. Stuart*, Ky.App., 671 S.W.2d 262 (1984) ]. *When they are not in session, they are not a legislature.*

The legislature is not a corporate body, and its officers are not authorized to accept service on behalf of their fellow members. Furthermore, it is contrary to the nature of our representative form of government to permit interference by the court with the internal functioning of the legislature." [Emphasis added.] 585 P.2d at 127.

Using a very liberal procedural construction, our Majority Opinion reaches the conclusion that the President Pro Tempore and Speaker of the House "were in fact named in a representative capacity." The question is, representing who? Certainly not the individuals who will serve in the next General Assembly. This Court cannot assert power over these future legislators to direct their future actions or to punish them for contempt if they fail to legislate in response to our mandate in a manner that we deem appropriate.

In *Legislative Research Comm'n v. Brown*, Ky., 664 S.W.2d 907 (1984), wherein it was the General Assembly trying to expand the nature of its legislative function rather than the judiciary seeking to direct it, we stated:

"The Kentucky General Assembly is not one of continuous session.... A legislative body ceases to exist at the moment of its adjournment." 664 S.W.2d at 915.

The Speaker of the House and the President Pro Tempore of the Senate were elected to preside at the *last* legislative session. They cannot be designated as representatives of a body that "ceases to exist." Under our Constitution the House of Representatives and the Senate have power to choose officers anew "biannually." Ky. Const. § 34. This means they must be elected anew every two years, when the General Assembly regenerates and reorganizes as provided for in the Kentucky Constitution § 36. Who is the legal representative for the next General Assembly between sessions when it has no official existence? For that matter, who is to say that an order entered against the leadership while in session is binding upon the members of the General Assembly?

In sum, it is pure fiction, not legal fiction, to hold that the President Pro Tempore and the Speaker of the House at the last legislative session represent the General Assembly, or that the General Assembly is before this Court in this case for purposes of adjudication. This is a lawsuit

---

**3.** The judgment is final as to the Governor, whether meaningless or not. Nevertheless, Justice Gant's Opinion suggests that the case "should be remanded to the Franklin Circuit Court with direction to immediately issue writs of mandamus requiring the Governor to call an Extraordinary Session of the General Assembly." This shows how far one's thinking can go once we forget we are confined to the limitations of a justiciable controversy.

with no defendants. It is one thing to order a school district to take some specific actions required by the constitution or statutes, or to desist from actions contrary thereto, as was done in *Wooley v. Spalding*, Ky., 293 S.W.2d 563 (1956), and quite a different thing to declare unconstitutional the action of legislators as individuals or as a body in failing to enact "appropriate legislation" to "provide for an efficient system of common schools throughout the State [Ky. Const. § 183]," particularly when we have not been asked to designate any specific legislation as constitutionally inappropriate. A school district is a legal entity created by statute with a corporate existence. Its actions as a body may be judicially reviewed and it may be ordered as a body by a court to take certain specific actions that the law requires. Such is not the case with our General Assembly.

Finally, there is one further procedural problem when we undertake to order legislators what to do. The manner in which legislative power is exercised, like judicial power, is discretionary. It is fundamental premise of mandamus against public officials in the exercise of legislative or judicial power, that mandamus will not lie to compel the exercise of a discretionary power in any particular way. *Fannin v. Keck*, Ky., 296 S.W.2d 226 (1956); *Childers v. Stephenson*, Ky., 320 S.W.2d 797 (1959); *Kaufman v. Humphrey*, Ky., 329 S.W.2d 575 (1959). Thus, even had we the power to order the General Assembly to enact new or different legislation on the subject of school financing or management of the public school system, it is beyond our power to suggest what the remedial legislation should be.

We have exceeded the judicial power vested in the Court of Justice by Section 109 of the Constitution and violated the doctrine of separation of powers constitutionalized in Sections 27 and 28 of the Kentucky Constitution.

At the heart of this case is the problem created by the uneven tax base for support in a public school system that is built on local property taxes. This problem is not unique to our state. Supreme courts from several of our sister states, confronted with this problem and caught up in a rush of judicial activism, have attempted to intervene judicially in the legislative process. *None* have undertaken to intervene where the issues were as nonspecific as presented here, and thus as incapable of judicial resolution. Further, as subsequent cases from West Virginia and New Jersey attest, when they intervened in the process their initial rulings were just the beginning of a long-running dialogue. They have been confronted with complex sequels to original decisions that did not improve matters significantly in the first place. They have been inundated with subsequent litigation.

An appreciation of the difference between legislative and judicial lawmaking is essential to maintaining constitutionally mandated separation of powers. Speaking to the constitutional limitations inherent in the separation of powers doctrine, in *Valley Forge College v. Americans United*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, 709 (1982), the United States Supreme Court explains that the "actual controversies" principle:

"at an *irreducible minimum* ... requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' [Citation omitted], and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision,' [Citation omitted].... [J]udicial power [is limited] 'to those disputes which confine ... courts to a rule consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process.'" [Emphasis added.]

The case now before us fails to meet this "irreducible minimum" necessary to invoke judicial power.

This same concept is thus explained by legal historian G. Edward White of the University of Virginia School of Law in his recent book, *The American Judicial Tradition*, 2d ed., p. 461 (1988):

"The power of judges pertains only to those matters peculiarly 'legal,' as distinguished from political.... [T]he burden of judicial opinion-writing, then, has been to show that a decision has not been grounded on other than 'legal' considerations, and that within that ambit it analyzes legal issues in an intelligible fashion."

Since publication of the initial Majority Opinion three months ago, the predominant reaction from the public, the press, and the politicians, has been that our decision provides the Governor and General Assembly an unprecedented *opportunity* to reform a deficient state educational process. The operative word is "opportunity," not "power," because the General Assembly has always had the same "power" it has now to reform the system. We have not enhanced its power. Unfortunately, providing opportunities at the expense of the integrity of the judicial process is not a traditional item on the judicial agenda, nor in my view an appropriate role for the courts.

Our Majority Opinion is fundamentally unsound, not because there is no problem but because the case does not present issues capable of judicial resolution. We have now become part of the problem when we intend to be part of the solution.